## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

THE UNITED STATES OF
AMERICA AND THE STATE OF
MICHIGAN ex rel. AMINE P.
AMINE, M.D. individual,
REDWAN ASBAHI, M.D
Plaintiffs,

vs.

Case No.: 2-21-cv-10799

TEAM HEALTH HOLDINGS, INC,
A TENNESE COMPANY AND
MAHMUD ZAMLUT, M.D.
Defendants.

## AMENDED COMPLAINT FOR VIOLATION OF FALSE CLAIMS ACT (31 U.S.C. §§3729 *et seq*.), THE MICHIGAN MEDICAID FALSE CLAIMS ACT (M.C.L. §§400.601 *et seq*.) AND THE ANTI-KICKBACK STATUTE TRIAL BY JURY REQUESTED

Pursuant to 31 U.S.C. §3730(b)(1) and M.C.L. §400.610a (1), Relators Amine P.

Amine, M.D and Redwan Asbahi, M.D., for themselves and on behalf of the

United States of America and the State of Michigan, by his attorneys MAF Law

PC, brings this Amended Complaint under the federal False Claims Act and the

Michigan Medicaid False Claims Act.

## INTRODUCTION

This case involves fraudulent medical billing of patients not seen by Defendant

Mahmud Zamlut, M.D, as well as other physicians engaging in the same conduct.

This case further involves fraudulently billing of medical consults for pulmonology patients by Defendant Mahmud Zamlut that were not medically necessary. The aforementioned were subsequently billed to the taxpayers.  Defendant Zamlut engaged in this illegal activity as part of a kickback scheme with his employer Defendant Team Health Holdings, Inc in order to significantly increase revenues for his employer who in turn rewarded Zamlut with substantial bonuses. Defendants working in concert with one another and others, violated Medicare and Medicaid rules and regulations, the federal False Claims Act and the Michigan Medicaid False Claims Act, and the Anti-Kickback statute.  Defendants knowingly submitted claims for payment that were fraudulent, thereby damaging the United States government.

## **JURISDICTION AND VENUE**

1.      This action arises under 31 U.S.C. § 3729 *et seq*., also known as the False Claims Act (the "FCA"), the Michigan Medicaid False Claims Act, and the common law to recover treble damages and civil penalties on behalf of the United States of America and the State of Michigan arising out of Defendants' violations of the FCA, as well as the Anti-Kickback Statute.

2.      Under § 3732 of the FCA, this Court has jurisdiction over actions brought under the FCA.  Furthermore, jurisdiction over this action is

conferred on this Court by 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.

3.    This Court has supplemental jurisdiction over all other claims set forth in this Complaint because these claims are so related to the claims arising under the FCA that they form part of the same case or controversy.  28 U.S.C. § 1367.

4.    Venue is proper in this district pursuant to § 3732(a) of the FCA, which provides that "any action under § 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by § 3729 occurred."  At all times material hereto, Defendants regularly conducted business within the State of Michigan, and maintained permanent employees and offices in the State of Michigan, within this judicial district. Additionally, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2).

## FILING UNDER SEAL

5.    Under the Act, this Complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days and shall not be served on Defendants until the Court so orders.  The United States Government and/or

the State of Michigan may elect to intervene and proceed with the action within sixty (60) days after the Government receives the Complaint.

6.      As required by the False Claims Act, Relator has served a copy of the Complaint and a written disclosure of substantially all material evidence and information in his possession to the United States Attorney General, the United States Attorneys' Office for the Eastern District of Michigan, and the Michigan Attorney General.

7.      Relators are original sources of the information conveyed herein and have reported the criminal conduct outlined herein to a Special Agent from the FBI's Detroit office and sent the United States Attorney's Office for the Eastern District of Michigan a Notice Letter on or about December 4, 2020.

## **PARTIES**

8.      Defendant, Team Health Holdings, Inc. (hereinafter "TEAM HEALTH") is a healthcare services company that recruits, employs and then outsources thousands of healthcare providers including physicians to various hospitals and/or hospital groups throughout the United States. Upon information and belief, TEAM HEALTH employs more than 20,000 healthcare providers in hospitals, acute care facilities and physician groups nationwide. According to their website, TEAM HEALTH represents that "No matter the

setting, our innovative service model enhances quality and efficiency." It appears that TEAM HEALTH primary revenue is derived from placing physicians and other health care providers in hospitals and facilities that support emergency medicine, critical care, anesthesiology, orthopedic, surgery, hospitalist, and general medical call care solutions.

9.     According to publicly available information, TEAM HEALTH merged with the Blackstone Group. In or around 2017 the Blackstone Group invested 6.1 billion dollars in TEAM HEALTH. By simply outsourcing medical personnel similar to the way a staffing company does, TEAM HEALTH who is headquartered in Knoxville, Tennessee generates billions of dollars per year in revenue.

10.     Defendant, Dr. Mahmud Zamlut (hereinafter "ZAMLUT") is a board-certified pulmonologist, he is a physician that has priveledges at various hospitals throughout the Midwest. For purpose of this action, Relators state that ZAMLUT has privileges at the Detroit Medical Center (hereinafter "DMC") and Highpoint Health (hereinafter "HP Health") hospital located in Lawrenceburg, Indiana.

11.     Relator, Amine P. Amine, M.D. (hereinafter "AMINE") has been a physician since 2014 and had been employed by IPC (now TEAM

HEALTH) from approximately July 2017 until August of 2020 when he was wrongfully terminated by Defendant ZAMLUT and TEAM HEALTH.

12.    Relator, Redwan Asbahi, M.D. (hereinafter "ASBAHI") is also a physician since 2012, he was employed by TEAM HEALTH from approximately July 2016 through approximately the fall of 2020.

## APPLICABLE FEDERAL LAWS AND REGULATIONS

### A.    The False Claims Act

13.    Under the FCA, 31 U.S.C. § 3729(a)(1)(A), it is a violation of federal law to knowingly present or cause to be presented a fraudulent claim to the United States. For every violation, the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of $5500 to $11,000 per claim for claims made on or after September 29, 1999.

14.    The FCA, 31 U.S.C. § 3729(a)(1)(B), makes it a violation of federal law to knowingly make, use, or cause to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government. The United States may recover three times the amount of the damages that the government sustains and a civil monetary penalty of $5,500 to $11,000 per claim for claims made on or after September 29, 1999.

15.     Under FCA, 31 U.S.C. § 3729(a)(1)(C), prohibits conspiring to commit a violation of the FCA, liable for three times the amount of the damages the Government sustains and a civil monetary penalty between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

16.     The FCA, 31 U.S.C. § 3729(a)(1)(G), makes it a violation of federal law to knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government. It further makes it a violation of federal law to knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the Government.

17.     The FCA defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property, which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested, 31 U.S.C. § 3729(b)(2).

18.     The FCA, 31 U.S.C. § 3729(b)(1) provides that "'knowing' and 'knowingly'—(A) mean that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the

truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud."

19.     The FCA, 31 U.S.C. § 3729(b)(4) provides that "'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." A violation of the Anti-Kickback Statute renders resulting claims to Medicare false or fraudulent in violation of the FCA. Moreover, the Patient Protection and Affordable Care Act, Publ. L. No. 111-148, 124 Sta. 119 § 6402(f)(1) (2010), described *infra*, makes clear violations of the AKS give rise to liability under the FCA.

20.     This Complaint should be deemed to include violations of the FCA prior to the Fraud Enforcement and Recovery Act ("FERA"), which covers Defendant's violations on or before May 20, 2009, when Congress amended and renumbered the FCA pursuant to FERA

### B. <u>The Anti-Kickback Statute</u>

21.     The Medicare and Medicaid Patient Protection Act, also known as the AKS, or the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that the remuneration and gifts given to those who can influence health care decisions corrupts medical decision-making and can result in the provision of goods and services that are more expensive and/or

medically unnecessary or even harmful to a vulnerable patient population. To protect the integrity of the federal healthcare programs, Congress enacted a prohibition against the payment of kickbacks in any form. The AKS was enacted in 1972 "to provide penalties for certain practices which have long been regarded by professional organizations as unethical, as well as unlawful… and which contribute appreciably to the cost of the Medicare and Medicaid programs." H.R. Rep. No. 92-231, 92d Cong., 1st Sess. 108 (1971), reprinted in 1972 U.S.C.C.A.N. 4989, 5093.

22.     In 1977, Congress amended the Anti-Kickback Statute to prohibit receiving or paying "any remuneration to induce referrals and increased the crime's severity from a misdemeanor to a felony with a penalty of $25,000 and/or five years in jail." *See* Social Security Amendment of 1972, P.L. No. 92-603, 241(b) and (c); 42 U.S.C. § 1320a-7b. In doing so, Congress noted that the purpose of the AKS was to combat fraud and abuse in medical settings that "cheats taxpayers who must ultimately bear the financial burden of misuse of funds...diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide needed quality health services…[and] erodes the financial stability of those state and local governments whose budgets are already overextended and who must commit an ever-increasing portion of their financial resources to fulfill the obligations

of their medical assistance programs." H.R. Rep. No. 95-393, pt. 2, at 37, reprinted 1977 U.S.C.C.A.N. 3039, 3047.

23.    In 1987, Congress again strengthened the AKS to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. See Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142, Medicare and Medicaid Patient and Program Protection act of 1987, Pub. L. No. 100-93.

24.    The AKS prohibits any person or entity from knowingly and willfully offering to pay or paying any remuneration to another person to induce that person to purchase, order, or recommend any good or item for which payment may be made in whole or in part by a federal health care program, which includes any state health program or health program funded in part by the federal government. 42 U.S.C. §§ 1320a-7b(b), 1320a-7b(f).

25.    The statute provides, in pertinent part:

(b) Illegal remunerations

* * *

(2) Whoever knowingly and willfully offers or pays any remuneration (including    any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash    or in kind to any person to include such a person--
(A) To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under Federal healthcare program, or
(B) To purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

26.     A recipient of remuneration is also liable under the AKS, 42 U.S.C. § 1320a-7(b), if he or she:

knowingly and willfully, solicits or receives any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal health care program, or in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a federal healthcare program.

27.     In addition to criminal penalties, a violation of the AKS can also subject the perpetrator to exclusion from participation in federal health care programs (42 U.S.C. § 1320a-7(b)(7)), civil monetary penalties of $50,000 per violation (42 U.S.C. § 1320a-7a(a)(7)), and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose, 42 U.S.C. § 1320a-7a(a).

28.     Accordingly, under the AKS, healthcare service providers such as TEAM HEALTH, may not offer or pay any remuneration, in cash or in kind, directly or indirectly, to induce physicians to refer patients for services or procedures that may be paid for by a federally-funded healthcare program such as Medicare. Likewise, the AKS prohibits physicians, like Defendant

ZAMLUT from soliciting or receiving any remuneration in return for referrals, in this case self-referrals as a pulmonologist.

29.     The AKS not only prohibits outright bribes, but also prohibits any payment or other remuneration by a healthcare system in a physician or other person which has, as one of its purposes, the inducement of the physician to influence or recommend the healthcare system.

30.     Pursuant to the Patient Protection and Affordable Care Act, Publ. L. No. 111-148, 124 Stat. 119 § 6402(f)(1) (2010) ("PPACA"), which became law on March 23, 2010, claims for items or services billed to government-funded healthcare programs, including Medicare, "resulting from" a violation of the AKS are "false or fraudulent claims" under the FCA.

31.     PPACA also clarified the intent requirement for the AKS, and now provides that "a person need not have actual knowledge of this section or specific intent to commit a violation" of the AKS in order to be found guilty of a "willful violation." Accordingly, proof that a defendant knew of and specifically intended to violate the AKS is no longer required, instead proof that the defendant intended to perform the actions that violated the AKS gives rise to a violation.

32.     At all times relevant to this Complaint, compliance with the AKS has been a condition of participation for a health care provider under

Medicare, Medicaid, and other federally-funded healthcare programs. Moreover, compliance with the AKS is a condition of payment for claims.

33.     For example, under 42 U.S.C. § 1395y(a)(1)(A), "nonpayment may be made [under the Medicare statute] for any expense incurred for items or services which. . . are not reasonable and necessary for the diagnosis or treatment of illness or injury."

34.     Kickbacks are, by definition, not "reasonable and necessary for the diagnosis or treatment of illness or injury."

35.     As set forth herein, TEAM HEALTH continues to foster a culture of kickbacks in cash and kind to many physicians to induce referrals. Likewise, Defendant ZAMLUT has solicited and accepted such kickbacks in exchange for unnecessary and illicit self-referrals, and other physician referrals by TEAM HEALTH physicians that are not medically necessary for the sole purpose of driving up revenue for TEAM HEALTH and those hospitals who contract with TEAM HEALTH.

36.     By definition, pursuant to the PPACA and firmly established law prior to the clarification set forth therein, TEAM HEALTH and Defendant ZAMLUT's violations of the AKS rendered all claims, which were for services provided pursuant to a referral tainted by a kickback, as false, as defined by the FCA.

37.     Thus, TEAM HEALTH, Defendant ZAMLUT and others are liable for causing the submission of these false claims.

38.     Additionally, certain providers, such as hospitals, participating in federal healthcare programs must annually certify compliance with the AKS. This certification is included in CMS Form 2552 cost report, which providers submit each year. The federal Medicare program and the state Medicaid programs rely upon this certification in making payments to such providers. The "advisory" language preceding the certification section read as follows:

Misrepresentation or falsification of any information contained in this cost report may be punishable by imprisonment under federal law. Furthermore, **if services identified by this report were provided or procured through the payment directly or indirectly of a kickback** or were otherwise illegal, criminal, civil and administrative action fines, and/or imprisonment may result.

(Emphasis added).

The specific certification language reads:

Certification by officer or administrator or provider(s)

I hereby certify that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and expenses, prepared by [Provider(s) Names and Number(s)] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. **I further certify that I am familiar with the laws and regulations regarding the provision of health care services and that the services identified in this cost report were provided in compliance with such laws and regulations.**

(Emphasis added)

39.     Payment to providers under federal healthcare programs--not just participation in those programs--is conditioned upon this express certification that the provider has complied with the AKS. Providers' suppliers are also bound by the rules and regulations underlying the AKS. See 42 C.F.R. § 1001.952(h)(2). Thus the CMS Form 2552 cost reports submitted to Medicare and Medicaid programs by any provider receiving kickbacks from Defendant TEAM HEALTH, such as Defendant ZAMLUT, were false for purposes of the FCA because they contained a false certification of AKS compliance.

40.     Although the AKS provides certain safe harbors, none of TEAM HEALTH or ZAMLUT's violations meet the constraints of regulatory safe harbor exceptions.

### C.     The Michigan Medicaid False Claim Act

41.     MCL 400.601, *et seq*., known as the Michigan Medicaid False Claim Act ("MFCA"), models the Federal False Claims Act described *supra*.

42.     Under, MCL 400.604, it is a violation to solicit, offer, or receive a kickback or bribe in connection with a furnished service, for which payment is made in whole or in part pursuant to state Medicaid. Furthermore, MFCA makes it a violation to receive make or receive a payment or receive a rebate of a fee or charge for referring an individual to another person is

punishable by imprisonment for not more than 4 years, or by a fine of not more than $30,000, or both.

43.     MCLA 400.606 makes it a violation to agree or conspire to defraud the state by obtaining, or helping another to obtain, a payment of false claim. Those who violate this provision are punishable by imprisonment for not more than 10 years, a fine of not more than $50,0000, or both.

44.     MCLA 400.607 makes it a violation to present or cause to be presented a false claim to a state employee or officer, where that claim falsely represents that service or goods were medically necessary in accordance with professionally accepted standards. Every such claim is a separate offense. Moreover, it is a violation to make, use, or cause to be made or used a false record or statement in order to conceal, avoid, or decrease an obligation to pay money to the state pertaining to a claim. Violations of MCLA 400.607 is punishable by imprisonment for not more than 4 years, a fine of not more $50,000, or both.

45.     MCLA 400.602(f) defines knowing as being "in possession of facts under which he or she is aware or should be aware of the nature of his or her conduct and that his or her conduct is substantially certain to cause the payment of a Medicaid benefit." MFCA also covers "acting in deliberate ignorance of the truth or falsity of facts or acting in reckless disregard of the

truth or falsity of facts." MFCA does not require proof of specific intent to defraud.

## MEDICARE PROGRAM

46.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. §1395 et seq., known as the federal Medicare program, which authorizes medical benefits for the elderly, blind and disabled.  The Centers for Medicare and Medicaid Services ("CMS"), an agency of the United States Department of Health and Human Services, is directly responsible for the administration of the Medicare program.

47.     Medicare reimbursements for health care services are regulated by CMS, which issues mandatory guidelines on what types of health care services are covered and which are non-covered.  There are two controlling coverage policies: National Coverage Determinations (NCDs) and Local Coverage Determinations (LCDs).

48.     The Medicare NCDs are set out in a series of Medicare Benefit Policy Manuals, which detail whether specific medical items, services, treatments, procedures or technologies will be paid for by Medicare in accordance with title XVIII of the Social Security Act and in compliance with Medicare regulations and rulings.  LCDs are developed by each Medicare Part

B regional carrier to further specify under what clinical circumstances a service is reasonable and necessary.

49. The Medicare Part B regional carrier for Michigan is Wisconsin Physicians Service Insurance Corporation (WPS).

50. In addition to the NCDs and LCDs, the Social Security Act outlines specific parameters for when a service will be covered. Importantly, Section 1862(a)(1)(A) of the Act allows coverage and payment for only those services that are considered medically reasonable and necessary.

## MEDICAID PROGRAM

51. Medicaid was established by Title XIX of the Social Security Act of 1965, 42 U.S.C. §1396-1396v. Medicaid is a jointly-funded federal-state program and enables states such as Michigan to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary medical services.

52. Although Medicaid is funded in significant part by the States, the federal government pays a portion of Medicaid costs. In Michigan, the federal government pays for approximately 56 percent of all Medicaid health care serves, while the State of Michigan funds the remaining 44 percent. Accordingly, all claims or requests for payments submitted to the Medicaid

program are subject to liability under both the federal FCA and the Michigan False Claims Act.

53.     All providers who submit claims to the Michigan Medicaid program are required to honor the terms and conditions of the Michigan Medicaid Provider Manual, in accordance with the terms of their Enrollment Agreement.

54.     In other words, compliance with the terms of the Michigan Medicaid Provider Manual is required in order to properly bill for services.

**OVERVIEW OF FRAUDULENT CONDUCT AND ACTIVITIES**

55.     As previously outlined, TEAM HEALTH offers careers for physicians, hospital management personnel and staffing services for health care facilities across the United States. TEAM HEALTH has agreements in place whereby they 'staff' or outsource physicians, often under a pod leader at any given hospital or facility.

56.     Defendant ZAMLUT is a pod leader with a senior supervisory role and is paid as such by TEAM HEALTH. In fact, under his agreement with TEAM HEALTH, ZAMLUT enjoys priveledges and works out of many hospitals located in the Midwest part of the United States.

57.     At all relevant times related to this complaint, ZAMLUT had a contract with and was paid by TEAM HEALTH. TEAM HEALTH in turn, had

contractual agreements and was paid by various hospitals and/or health care facilities to provide physicians such as ZAMLUT to staff their hospitals. As a pod leader, ZAMLUT would also be responsible for managing other TEAM HEALTH employed physicians who reported to him.

58.    TEAM HEALTH continues to provide contracted physicians including ZAMLUT to the Detroit Medical Center ("DMC"). The DMC is made up of various entities including Detroit Receiving, Sinai Grace and Harper Hospital where ZAMLUT himself treated patients but also managed other physicians employed by TEAM HEALTH as their pod leader. Among these physicians reporting to ZAMLUT were Relators AMINE and ASBAHI.

59.    Although technically separate agreements, ZAMLUT was also appointed by TEAM HEALTH as the pod leader of both Relators as it relates to the medical services for other hospitals including Highpoint Health (hereinafter "HP Health"), this community hospital is located in Lawrenceburg, Indiana approximately 275 miles away from the DMC and the metro Detroit area.

60.    Relator AMINE was during his employment at TEAM HEALTH an H1B candidate. Through this H1B AMINE was set to become a permanent resident and eventually a citizen of the United States. AMINE had every aspect of his work controlled and often dictated by pod leader

ZAMLUT. This included what hospital, what day and time AMINE would work and even the structure of his contract(s). During his times of employment, ZAMLUT was AMINE'S only superior and point of work contact, ZAMLUT dictated when and where he would work without input or redress by AMINE.

61.     During all relevant times outlined in this complaint, in addition to managing AMINE and ASBAHI, ZAMLUT was also the pod leader for several other physicians at both the DMC and HP Health.

62.     Over the course of his employment and incrementally, ZAMLUT demanded every patient be referred to him for a pulmonology consult even when it was clear that no medical basis existed for these patients to be seen by a pulmonologist.

63.     ASBAHI also worked directly with and under separate contract(s) with TEAM HEALTH from approximately July 2016 until the fall of 2020 where ZAMLUT was also his pod leader.

64.     ASBAHI and AMINE met one another when they both worked for TEAM HEALTH, often they provided medical services to patients located at either the DMC and/or HP Health, ASBAHI also reported to ZAMLUT.

65.     AMINE and ASBAHI would often fly to Indiana and/or drive back and forth to Detroit during their tenure as staff physicians for TEAM

HEALTH, as such they had absolute access to all patient charts for those treated by other physicians within the TEAM HEALTH pod, including ZAMLUT. As such, the evidence to support the allegations as contained herein is objective and firsthand.

66.     It was not unusual for Relators AMINE and ASBAHI to treat the same common patients at either or both hospitals.

67.     Like other TEAM HEALTH employed physicians both Relators also had absolute access to physician schedules that were always displayed and set out in advance on the company's portal.

68.     In 2018, although living in metro Detroit, AMINE worked almost every weekend at HP Health, he therefore travelled frequently by airplane to Lawrenceburg, Indiana. Aside from HP Health AMINE primarily worked at the DMC in Detroit, MI.

69.     Notably, ASBAHI and AMINE worked as internists while ZAMLUT, because he was board certified in both pulmonology and internal medicine and billed as ***both***, an internist as well as a pulmonologist.

70.     Whenever it benefitted him or his scheme as outlined herein, ZAMLUT would provide services to patients as an 'internists.' Likewise, he accepted and often demanded referrals by others physicians in his pod as a specialists (pulmonology) when it suited him.

71. Although both Relators and ZAMLUT worked at and enjoyed priveledges at other hospitals in metro Detroit and in Indiana, the majority of firsthand evidence and observation relating to misconduct as outlined in this complaint occurred and continues to occur at the DMC in Detroit, Michigan and HP Health in Lawrenceburg, Indiana.

72. Upon information and belief many other physicians that are part of ZAMLUT's pod are benefiting and or/involved in the fraud as outlined herein.

73. ZAMLUT'S goal was not overly sophisticated. He wanted to generate as much revenue as possible by unlawfully billing patients he never saw, so that he would receive bonuses and as much money as he could from TEAM HEALTH.

74. All physicians employed by TEAM HEALTH received bonuses based on a formula driven by how many patients they see. Simply stated the more patients seen and billed for by any physician, the more money they make. Every few months RVU's were tallied and physicians working for TEAM HEALTH could earn a 'bonus.'

75. In addition to the above referenced method to earn a bonus from TEAM HEALTH, as pod leader, ZAMLUT could earn another bonus if

his pod saw and billed for a certain number or patients. Each threshold of total patients achieved meant more money for ZAMLUT.

76.     It was evident from the onset to Relators, that ZAMLUT was entirely focused on meeting the highest RVU targets set forth by TEAM HEALTH by seeing or billing for as many patients as possible, he did so with little regard to patient care or safety.

77.     At first, Relators witnessed other physicians in the pod consistently refer patients unneccesarily to ZAMLUT for a 'pulmonology' consultation. These examples have already been reported to law enforcement.

78.     Initially, ZAMLUT politely and in a matter-of-fact manner requested that Relators consult him 'more' as a pulmonologist.

79.     Over time, ZAMLUT began to exert incremental pressure on Relators to 'refer' patients to him for pulmonology consults, even when it was clearly not indicated or necessary for the patient to see a specialist.

80.     Fraudulently billing for uneccessary pulmonology consults for ZAMLUT was not enough.   Relators discovered that ZAMLUT even encouraged others to also bill for patients they did not *see at all.*   In other words, on some days, either ZAMLUT or members of his pod billed on the same day patients in both Michigan and Indiana but didn't treat patients in *either* state.

81.     As they became more ostracized from the ZMALUT pod, Relators began to confer with one another after working shifts at HP Health and the DMC.

82.     ASBAHI and AMINE began to notice the high number of patients in both HP Health and the DMC who according to medical charts had allegedly been seen by ZAMLUT in his capacity as both an internist and also a pulmonologist.

83.     Although one major reason ASBAHI was forced to resign from the TEAM HEALTH/DMC contract he worked under in 2019 was because of the pressure to consult ZAMLUT unneccesarily and the pressure ZAMLUT created to bill at any cost and without regard to the law. ASBAHI made it clear to ZAMLUT that he could not and would not consult him when medically unnecessary.

84.     Although forced out of the DMC in 2019 by ZAMLUT, Dr. Asbahi worked at HP Health under a separate agreement 'as needed' until TEAM HEALTH terminated ASBAHI.

85.     ASBAHI was completely terminated by ZAMLUT in or around October of 2020 when it became obvious to ZAMLUT that ASBAHI knew of the seismic nature of the fraud, reported it and in every instance he refused to go along with it.

86.    It wasn't long after Asbahi's stopped working for TEAM HEALTH at the DMC that   ZAMLUT increased the pressure on onto AMINE for not consulting ZAMLUT on 'every patient' for pulmonology.

87.    As punishment for failing to refer fraudulent consults to ZAMLUT, AMINE was made to work many weekends at HP Health and was reduced significantly from working at nearby DMC. This was done to 'motivate' AMINE to 'play ball,' those who did what ZAMLUT wanted didn't have to travel to Indiana and/or work late shifts.  They also got the benefit of being able to bill for more patients at the DMC, the DMC was much busier than HP Health making it easier to achieve bonus numbers.

88.    The scope and breadth of the fraudulent scheme became clearer upon Relators access and closer review of the schedule at HP Health. In doing so, the Relators were able to figure out that ZAMLUT only showed up to HP Health on the weekends. He was often listed on the schedule during the week; however, this was done so that when he billed during the week, the fraudulent ghost rounding would be better concealed.

89.    In speaking to patients in Michigan and Indiana that had medical record notes that they had been treated by ZAMLUT, both AMINE and ASBAHI were able to confirm beyond any doubt that ZAMLUT was

billing for dozen of consults a day at Michigan hospitals (DMC and its subsidiaries) and/or at HP Health in Lawrenceburg, Indiana. Stated differently, it wasn't just that he couldn't possibly bill for patients in two different states on the same day, he would often bill for the higher rate for a specialist consult in his capacity as a "pulmonologist."

90.     Some of these fraudulent patient encounters in Michigan and Indiana were documented in such a way to make it appear that it is 'possible' that ZAMLUT could for example round on patients in the evening at the DMC and do the same later that day at HP Health.

91.     Aside from travel records not supporting such herculean billing by ZAMLUT, even if he and members of his pod had a private jet that went door to door whenever he chose without a moment's notice, there are many days in which ZAMLUT billed more than 100 patient consults per day for 6-7 consecutive days.

92.     Furthermore, it was obvious this systemic fraud could not have been done without the participation of other physicians in ZAMLUT's pod, it couldn't not have been done without the tacit or active approval from TEAM HEALTH admin, human resources and billing.

93.     For example, admin at HP Health posted physician schedules, the schedule frequently did not have ZAMLUT on it, although Relators saw

him at HP Health. This was done because ZAMLUT was billing for consultations and other services at the DMC, therefore, he didn't want to bring attention to himself by listing himself on the HP Health schedule where questions could be raised. In hindsight, Relators began to recall last minute 'changes' or swapping of shifts by ZAMLUT. This was done to prevent his fraud from being detected. In other words, another physician from the pod would be listed on any given day but it would be ZAMLUT who actually showed up for the shift.

94.     Relator's recall asking ZAMLUT at varying times why his name wasn't on the schedule to be at HP Health yet he was there. ZAMLUT would advise he was 'covering' for another physician that is why his name wasn't on the schedule. However, Relators now know that ZAMLUT wasn't 'covering' for another physician.

95.     Relators realized that ZAMLUT in such instances as the aforementioned paragraph was also listed and scheduled on TEAM HEALTH's website to be at the DMC in Detroit. It became obvious that ZAMLUT could only list DMC or HP Health on any given day, otherwise he would risk being outed if someone outside of TEAM HEALTH's admin, human resources or upper management linked the patient entries/billing

because no physician could be in two states at the same time, especially billing the levels and volume of patients that ZAMLUT did.

96.    Upon information and belief, not only is ZAMLUT billing for patients he is not seeing, he is also referring patients to other 'specialists' within his pod when medically uneccessary.

97.    Upon information and belief, over at least the past 7 years ZAMLUT and other pod members have billed patients they have never seen or met, often ZAMLUT was not even in the same state as the patient. Furthermore, the fraud wasn't only at HP Health in Indiana, it was also ongoing at the DMC and upon information and belief other hospitals.

98.    Over time, the fraud was more brazen and caused substantial patient safety issues.  Relator AMINE prior to concluding his notice period spoke to several patients at the DMC who on his shift complained of not being seen by _any_ physician for days or longer. Upon inspection of their charts, AMINE noticed that ZAMLUT had notated in the complaining patients' medical records that ZAMLUT had seen them the prior day and for several days in a row.

99.    When asked by AMINE if the patients had been seen or treated by ZAMLUT, these patients denied **ever** seeing ZAMLUT.

100.     When asked by AMINE if the patients had been seen or treated by other physicians within the ZAMLUT pod (who also had notes in the patient charts) these patients also indicated they had not seen those physicians either.

101.     In fact the complaints by patients of not receiving medical treatment for days became so widespread at the DMC, Relator AMINE was in disbelief. AMINE to be certain of these claims, showed several patients pictures of ZAMLUT and other physicians within the pod. In all instances where medical notes were written into these particular patients charts by ZAMLUT and some of his pod members, these patients categorically denied that anyone from ZAMLUT or his team had seen them. Not only did nurses and other staff confirm this, but these unrelated patients signed affidavits confirming the same **(EXHIBIT A).**

102.     Upon information and belief, just based on Relators firsthand information and reasonable projections, ZAMLUT has billed at least hundreds of consults a month of patients he never saw during the past 7 years. Upon information and belief other pod physicians led by and in conspiracy with ZAMLUT did the same, in total it could be thousands of illegal consults per month and tens of thousands in total.

103.    Upon   information   and   belief,   ZAMLUT   has   billed approximately 200-300 'pulmonology consults' a month during the past 7 plus years that were medically unnecessary.

104.    Upon information and belief, TEAM HEALTH is aware of this fraudulent conduct because a simple audit of billing records would show that on any given day ZAMLUT bills for dozens of patients in two different states.

105.    Upon information and belief, TEAM HEALTH is responsible for uploading ZAMLUT'S billing data at both the DMC and HP Health. The same billing system and software is used by TEAM HEALTH for both HP Health and DMC.

106.    As such, the fraud as outlined in this complaint could or should have been easily detected by TEAM HEALTH admin, human resources or even upper management. Even if being in two different states billing at the same time was somehow undetectable, the sheer volume of patients billed per day should have been a red flag to TEAM HEALTH. It should have been flagged when they paid him soaring bonuses or even if they had conducted a generic internal audit.

107.    TEAM HEALTH, like its predecessor IPC has a history of placing profits above patients and their care.

108.     TEAM HEALTH incentivizes such conduct as outlined herein because of bonuses they pay based on "RVU's." While these contracts filled with incentives are seemingly innocuous on their face, for individuals such as ZAMLUT, they are a blueprint and motive to generate as much revenue as possible regardless of how it is done.

109.     As a 'pod leader' ZAMLUT has worked his way in gaining influence on who is able to even round at the DMC. For reasons unknown to Relators, ZAMLUT is somehow able to obstruct individuals from rounding if he doesn't receive consults from them.  In fact, it is an unspoken truth that if ZAMLUT is not consulted as a pulmonologist when an internist rounds, ZAMLUT and his allies will work to remove that individual from the call schedule.

110.     Over the last several years, corporate management at TEAM HEALTH has created pressure to generate more revenues by way of physicians such as ZAMLUT that it employs.

111.     Further and in exchange, more revenue generated means more money paid in 'incentives' or 'bonuses' to physicians such as ZAMLUT. TEAM HEALTH uses a carrot and a stick to get physicians to drive revenue for TEAM HEALTH customers such as the DMC and HP Health.

112. Relators set forth that the patient population being billed fraudulently by ZAMLUT is vulnerable, disadvantaged and approximately 85% Medicare or Medicaid.

113. Relators have evidence in the form of patient records of thousands of encounters where patients where not consulted by ZAMLUT and couldn't have been consulted because these patients were located in two different states. This evidence has been turned over to law enforcement.

114. Aside from the aforementioned, countless other examples of medically unnecessary 'consults' have been discovered by Relator. Even as recent as February and March of 2023, ZAMLUT continues engaging in fraudulent conduct on behalf of TEAM HEALTH.

## COUNT I
## Violation of 31 U.S.C. §3729

115. Relators reallege and incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

116. In performing the acts described above, Defendants, through their own acts or through the acts of their officers, knowingly and/or recklessly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A).

117.     Specifically, Defendants submitted claims for payment to the Medicare and Medicaid programs for services that were not medically necessary, or for services not performed whatsoever.

118.     The United States, unaware of the foregoing circumstances and conduct of the Defendants, made full payments, which resulted in its being damaged in an amount to be determined.

## COUNT II
## Violation of 31 U.S.C. §3729(a)(1)(B)

119.     Relators reallege and incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

120.     In performing the acts described above, Defendants, through their own acts or through the acts of their officers, knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. §3729(a)(1)(B).

121.     The United States, unaware of the foregoing circumstances and conduct of the Defendants, made full payments which resulted in its being damaged in an amount to be determined.

## COUNT III
## Violation of 31 U.S.C. §3720(a)(1)(G)

122.     Relators reallege and incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

123.    In performing the acts above, Defendants knowingly and improperly avoided an obligation to pay or transmit money to the United States Government.

124.    Specifically, Defendants unlawfully retained and failed to return the overpayments they received as a result of the false and fraudulent billings submitted to Medicare and Medicaid.

125.    Accordingly, the United States has been deprived of the use of such monies and has been damaged in an amount to be determined.

### COUNT IV
### Violation of M.C.L. §400.607(1)

126.    Relators reallege and incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

127.    In performing the acts described above, Defendants, through their own actions or through the acts of their officers, knowingly presented, or caused to be presented, to an officer or employee of the State of Michigan, a false claim under the Social Welfare Act in violation of M.C.L. §400.607(1).

128.    The State of Michigan, unaware of the foregoing circumstances and conduct of the Defendants, made full payments, which resulted in its being damaged in an amount to be determined.

### COUNT V
### Violation of MCL §400.603(1)

129.    Relators reallege and incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

130.    In performing the acts described above, Defendants, through their own acts or through the acts of their officers, knowingly made, used or caused to be made or used, a false record or statement to get false or fraudulent claims paid or approved by the State of Michigan in violation of MCL §400.603(1).

131.    The State of Michigan, unaware of the foregoing circumstances and conduct of the Defendants, made full payments, which resulted in its being damaged in an amount to be determined.

## COUNT VI
## Violations of the Anti-Kickback Statute
## 42 U.S.C. §1320a-7(b)

132.    Relators reallege and incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

133.    By virtue of the acts described in the preceding paragraphs, TEAM HEALTH knowingly and willfully offered to pay remuneration to physicians in order to induce physicians to generate as much revenue as possible.

134.    TEAM HEALTH caused HP Health and DMC to bill Medicare and Medicaid for the referred services, thereby submitting false claims caused by ZAMLUT in order to recover money for various reimbursements.

135.    While TEAM HEALTH may have had some legitimate purpose for offering benefits to physicians such as ZAMLUT, it, at least partially, intended such benefits to be remuneration for physicians generating as much revenue as possible.

136.    As a result, the United States has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations.

137.    TEAM HEALTH and ZAMLUT were aware of regulations prohibiting remuneration and inducements, but still regularly offered—and continues to offer—inducements for referrals. TEAM HEALTH and ZAMLUT have not ceased this practice despite knowing of the violations.

138.    No relevant safe harbor protects TEAM HEALTH or ZAMLUT'S activity.

**COUNT VII**
**Violations of the Anti-Kickback Statute**
**42 U.S.C. §1320a-7(b)(1)**

139.    Relators reallege and incorporate all preceding paragraphs of this Complaint as if fully set forth herein.

140. By virtue of the acts described in the preceding paragraphs, Defendant ZAMLUT knew he should not refer patients as an 'internist' to himself as a 'pulmonologists.'

141. TEAM HEALTH knew when they hired ZAMLUT that he was board certified in both. TEAM HEALTH is aware of the aforementioned self-referrals and knowingly solicited and accepted illicit remuneration from various hospitals it had contracts with (DMC and HP Health amongst others). TEAM HEALTH knew DMC and HP Health would in turn bill Medicare and Medicaid.

## COUNT VIII
## VIOLATION OF THE RETALIATION PROVISION OF THE
## FALSE CLAIMS ACT, 31 U.S.C. § 3730

142. Relators repeat and re-allege each and every preceding paragraph as if fully set forth herein.

143. The retaliation provision of the False Claims Act ("FCA") protects an employee, associated other, and/ or contractor from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more

violations of this subchapter." 31 U.S.C. § 3730(h)(1).

144.    Relief for violating 31 U.S.C. § 3730(h)(1) includes reinstatement of the employee, contractor, or agent with the same level of seniority that person would have had but for the discriminatory conduct, as well as double damages for back pay, interest on back pay, and special damages. Relief also includes reasonable attorneys' fees. *Id.* § 3730(h)(2).

145.    On numerous occasions, Relators engaged in lawful acts, as set forth  above and in more detail below, in efforts to stop 1 or more violations of the FCA, including but not limited to, 31 U.S.C. §§ 3729(a)(1)(B), 3729(a)(1)(G), 3729(a)(1)(A) and 3729(a)(1)(C) by all the Defendants and others associated with TEAM HEALTH.

146.    Relators ASBAHI and AMINE have reported multiple times during their employment issues governed by the FCA, such as physicians not rounding but billing as if they provided a medical service, being pressured for fictitious consults, and physicians performing medically unnecessary procedures/consults that either injured or even killed patient(s).

147.    As time went on, ZAMLUT advised AMINE that if his billing 'numbers didn't go up' he would be forced to let AMINE go. ZAMLUT stated that their 'wasn't enough revenue generated by AMINE. ZAMLUT further stated to AMINE that TEAM HEALTH directed him to terminate AMINE and

bring in a replacement who would generate 'more revenue.'

148.    Despite the complaints raised relating to clear-cut cases of unnecessary patient neglect, unnecessary patient consults, TEAM HEALTH executives including Dr. Zuberi only promised to take corrective action or to "investigate." In hindsight, this was to give the illusion of compliance.

149.    In fact when Relator AMINE first complained to Dr. Zuberi, he was led to believe that his concerns related to fraud and pressure to commit fraud as contained herein would actually be addressed.

150.    Expecting change, but seeing none, AMINE tried again to raise his same concerns regarding the Defendants' conduct with Dr. Zuberi.

151.     At this follow up meeting, Dr. Zuberi advised AMINE that he has 'already spoken to Dr. Zamlut' and he further advised AMINE that he 'need to put his big boy pants on' and to 'get to work and stop complaining.' He ended the meeting telling AMINE that if he had any other issues to 'take them up directly with Dr. Zamlut.'

152.    It wasn't long thereafter when AMINE was forced to concede that Dr. Zamlut, Dr. Zuberi and even TEAM HEALTH employed physician, Dr. Ali Hazimi, were aligned, conspiring and that he would be targeted for speaking out against their illegal conduct. In fact, Dr. Ali Hazimi confronted

AMINE insinuating that he knew that AMINE for a second time reported the unnecessary consultations to Dr. Zuberi. Dr. Ali Hazimi told AMINE that if anyone lost their job or their bonuses because he 'ratted' on them, that they would make sure he 'never works as a physician in America ever again.'

153.    In or around May of 2020, AMINE received a verbal 90-day notice of termination from TEAM HEALTH, delivered by ZAMLUT. ZAMLUT vacillated on if he was really going to go through with the verbal termination and even told AMINE in one email after the verbal notice that he 'hadn't been terminated.'

154.    AMINE was told by ZAMLUT that he was going to be given a new contract so that he could get his green card but that the 90 day period was going to be used to 'review his performance' and 'see what happens.'

155.    When it became obvious to ZAMLUT that AMINE wouldn't go along with his scheme, ZAMLUT became passive aggressive with AMINE. During these 90 days ZAMLUT went out of his way to force AMINE to work the least desirable shifts by forcing him to drive to Lawrenceburg, Indiana with little to no chance to earn any significant bonuses.

156.    During his final 90 days, AMINE noticed patterns that were more troubling than financially motivated fraud within the ZAMLUT pod, he noticed that sick patients weren't being treated by anyone. It was clear that

ZAMLUT and other pod members were billing for dozens of patients at a time without every seeing them and now due to not being seen some of these patients were actually in danger/harm as days at a time would pass without any medical treatment.

157.   Both AMINE and ASBAHI were terminated after reporting that they were being pressured into fraudulent conduct by ZAMLUT and also for refusing to participate in the fraudulent billing scheme as outlined herein.

158.   Despite having resigned in February 2019 from work on behalf of TEAM HEALTH at the DMC pursuant to one agreement, ASBAHI remained employed with TEAM HEALTH on a part time or "fill in basis" elsewhere, as such ASBAHI still had access to the TEAM HEALTH portal which had patient charts and records as well as physician schedules set out into the future several weeks out. ASBAHI continued to have this access until the fall of 2020 when he was terminated and locked out.

159.   While 'officially' both Relators were terminated without cause, they were both told that it was a 'business decision.' When pressed for what that meant, AMINE was told that there wasn't enough of a need for him to work, meaning they had too many physicians. AMINE knew this to be false because of the global pandemic and shortage of internal medicine physicians.

160.   AMINE was able to confirm the pretextual termination because

shortly thereafter, TEAMHEALTH hired *two* physicians to join the ZAMLUT pod.  Stated differently, AMINE and ASBAHI knew they were terminated as a direct result that both Relators complained to ZAMLUT and Dr. Zuberi of the fraudulent scheme in full operation at the DMC and HP.

161.    The Defendants even executed on their promise that Relator would never become an American, they not only terminated AMINE's employment but the manner, means and timing of the wrongful termination ensured he would not get his green card.

162.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

163.    Relators cannot at this time identify each false claim for payment that was caused by Defendants' conduct, as the claims have been presented by several separate entities and Plaintiffs do not have access to the records of all such false or fraudulent statements, records or claims.

164.    Relators were subsequently retaliated against, terminated and retaliated against post-termination due to their protected activity, more specifically because they reported fraudulent conduct and because they refused to engage in the same.

**COUNT IX**
**VIOLATION OF THE MICHIGAN MEDICAID**
**FALSE CLAIMS ACT, MCL § 400.610c**

165.    Relators repeat and re-allege each and every preceding paragraph as if fully set forth herein.

166.    The Michigan Medicaid False Claims Act ("Michigan Medicaid FCA") is an act "to prohibit fraud in the obtaining of benefits or payments in connection with the medical assistance program; to prohibit kickbacks or bribes in connection with the program; to prohibit conspiracies in obtaining benefits or payments; . . . to provide for civil actions to recover money received by reason of fraudulent conduct; . . . **to prohibit retaliation**; to provide for certain civil fines; and to prescribe remedies and penalties." Michigan Medicaid False Claim Act 72 of 1977. (Emphasis added).

167.    Additionally, "[a]n employer shall not discharge, demote, suspend, threaten, harass, or in any other manner, discriminate against an employee in the terms and conditions of employment because the employee engaged in lawful acts, including initiating, assisting in, or participating in the furtherance of an action under this act or because the employee cooperates with or assists in an investigation under this act." MCL § 400.610c.

168.    An employer who violates this section is liable to the employee

for all of the following:

(a) Reinstatement to the employee's position without loss of seniority;

(b) Two times the amount of lost back pay;

(c) Interest on the back pay;

(d) Compensation for any special damages; and

(e) Any other relief necessary to make the employee whole. MCL § 400.610c(2).

169. Over Relators stated reports and objections, Defendants, through their own acts or the acts of their officers, knowingly made, used or caused to be made or used, a false statement or false representation of a material fact in an application for Medicaid benefits to get false or fraudulent claims paid or approved by the State of Michigan in violation of MCL § 400.603(1).

170. Relators cannot at this time identify each false statement or false representation of a material fact made in applications for Medicaid benefits that was caused by Defendants' conduct, as the applications have been made by several separate entities and Relators do not have access to the records of all such false or fraudulent statements, records, claims or applications.

171. Relators took lawful acts in furtherance of an action under the Michigan Medicaid FCA with regard, but not limited to, MCL § 400.603.

They, on numerous occasions, reported and objected to Defendants' violations of this Act, as set forth in more detail above.

172.    Relators' were retaliated against and terminated due to their reports of violations of the Michigan Medicaid FCA by all the Defendants and others associated with Defendant Team Health.

173.    The State of Michigan, unaware of the foregoing circumstances and conduct of the Defendants, made full payments, which resulted in its being damaged in an amount to be determined.

## <u>PRAYER FOR LEGAL RELIEF</u>

WHEREFORE, Relators respectfully request that this Court enter judgment against Defendants as follows:

a. That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this Complaint, as the Civil False Claims Act, 31 U.S.C. §3729 *et seq*. provides;

b. That the maximum civil penalties be imposed for each and every false claim that the Defendants caused to be presented to the United States;

c. That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which Relator necessarily incurred in bringing this case;

d. That Relator be awarded the maximum amount allowed pursuant to the False Claims Act;

e. That the State of Michigan be awarded damages in the amount of three times the damages sustained by the State of Michigan because of the false claims alleged in this complaint, as the Michigan Medicaid False Claims Act, M.C.L. §400.612, provides;

f. That necessary expenses, costs, and reasonable attorney's fees be awarded as provided by the Michigan Medicaid False Claims Act;

g. Relief for violating 31 U.S.C. § 3730(h)(1) includes reinstatement of the employee, contractor, or agent with the same level of seniority that person would have had but for the discriminatory conduct, as well as double damages for back pay, interest on back pay, and special damages. Relief also includes reasonable attorneys' fees. *Id.* § 3730(h)(2).

h. That this Court award such other and further relief as it deems proper.

## <u>PRAYER FOR EQUITABLE RELIEF</u>

1.   An order from this Court placing Relators in the position they would have been in had there been no wrongdoing by Defendants, including reinstatement with back pay;

2.   An injunction out of this Court prohibiting any further acts of wrongdoing;

3.   An award of interest, costs and reasonable attorney fees; and

4.   Whatever other equitable relief appears appropriate at the time of final judgment.


## <u>DEMAND FOR A JURY TRIAL</u>

Relators demand a jury trial on all claims alleged herein.



Respectfully Submitted



/s/ Mohammed Abdrabboh
Mohammed Abdrabboh (P61989)
Attorney for Plaintiffs