# EXHIBIT B

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("**Agreement**") is entered into as the date this Agreement is executed by both parties hereto and shall be effective in accordance with Section 2.1 below, between **REDWAN ASBAHI, MD,** an individual ("**Employee**"), and **INPATIENT CONSULTANTS OF MICHIGAN, P.C., A MICHIGAN PROFESSIONAL CORPORATION** ("**Company**"). In consideration of mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## BASIC EMPLOYMENT

1.1 **Employment; Duties of Employee**.

(a) Hospitalist Services. During the Term (as defined in Section 2.1) of this Agreement, Company shall employ Employee and Employee shall be exclusively employed by Company to render Employee's services as a hospitalist physician ("**Hospitalist Services**") for Company in connection with its Hospitalist Operations (as defined in Schedule 1.1) in the Practice (as defined in Schedule 1.1). All of the schedules, riders and exhibits attached to this Agreement are incorporated in and are made a part of this Agreement by this reference.

(b) Exclusive Basis. Employee agrees to render Hospitalist Services on behalf of Employer on a full-time, exclusive basis. Employee agrees that he or she shall not render Hospitalist Services for any other person or party and shall not engage in any other health care related business or profession during the Term of this Agreement without prior written notice to and written approval from Company.

(c) Standards of Performance. Employee shall provide the Hospitalist Services under this Agreement consistent with the following standards of performance:

(i) All accepted standards of medical practice in Employee's specialty; Employee represents and warrants that Employee is currently board eligible in Employee's appropriate specialty and/or within two (2) years of the date of this Agreement, Employee will be board certified by the board of Employee's appropriate specialty, if Employee is not already so certified, and shall maintain such certification during the entire Term of this Agreement.

(ii) All applicable statutes and regulations, including, without limitation, Medicare and Medicaid statutes and regulations and the statutes and regulations relating to the licensure of physicians and surgeons and the practice of medicine;

(iii) All practice guidelines and protocols as may be established by Company from time to time; and

(iv) The terms and conditions of this Agreement.

(d) Availability. Employee shall be available to provide the Hospitalist Services described above in accordance with the schedules established by the Practice and the terms of this Agreement. Employee is responsible for obtaining substitute coverage from another employee of Company for his or her patients in the event Employee is unable to provide such coverage. Any such substitute coverage must be otherwise consistent with this Agreement and any applicable policies and procedures established by Company and the Practice.

1

Asbahi, Redwan MI FT Agreement, v-1

Issued: 5/24/16 ASD: 7/1/16

(e) <u>Professional Requirements</u>. Employee covenants, warrants and represents that Employee shall at all times during the Term of this Agreement:

(i) Provide medical and other health care related services (including medical directorship and other similar services) only through Company. Employee shall promptly pay to and hereby assigns to the Company all income earned or received by Employee from any person or entity other than Company related to the rendering of Employee's medical services (including medical directorship services) during the Term of this Agreement.

(ii) Comply with all applicable laws, rules, regulations, and standards, including, without limitation, those of the State Authority (as defined in <u>Schedule 1.1</u>) and the American Medical Association;

(iii) Have a valid drug enforcement agency number with which to prescribe controlled substances;

(iv) Be certified or eligible to be certified as a Medicare/Medicaid provider without having been excluded from any such programs;

(v) Comply with and abide by all policies and procedures the Company is required to comply with in connection with its relationships with third parties;

(vi) Maintain Employee's professional competence and skills commensurate with the standards of the medical community;

(vii) Notify Company promptly in writing concerning any denial, modification, reduction, restriction, suspension or termination (either voluntary or involuntary) of Employee's privileges at any Facility (as defined in <u>Schedule 1.1</u>); and

(viii) Employee is not currently applying for, been accepted into, or awaiting a determination on the acceptance into any fellowship program. Employee will notify Company immediately if the above information changes. Such information shall not impact Employee's eligibility to receive any Bonus compensation or benefits hereunder.

(ix) Notify Company within twenty four (24) hours in writing of any (A) modification, restriction, suspension or revocation of Employee's license to practice; (B) modification, restriction, suspension, or revocation of Employee's authorization to prescribe or to administer controlled substances; (C) imposition of sanctions against Employee under the Medicaid or Medicare program, or any other governmental program; or (D) other professional disciplinary action or criminal or professional liability action of any kind against Employee which is either initiated, in progress, or completed as of the Effective Date of this Agreement and at any other time during the Term of this Agreement.

(f) <u>Records and Reports</u>. At all times during the Term hereof, Employee shall timely and properly complete, in accordance with Company and hospital policies as such policies may be amended from time to time, all medical records and reports for patients for whom Employee has provided Hospitalist Services pursuant to this Agreement. If Employee fails to so timely complete such reports or records, then, in addition to being a material breach of this Agreement, Employee shall be liable for all damages or losses that Company may incur as a result of such failure.

2

1.2 **Compensation**.

(a) <u>Base Compensation</u>. The Company agrees to pay Employee during the Term a base salary (the "**Base Salary**") as set forth in <u>Schedule 1.2</u> attached hereto. The Base Salary shall be payable in arrears in equal payments at such frequency as is the custom and practice of the Company, but no less frequently than once per month.

(b) <u>Bonus Compensation</u>. In addition to Base Salary, Employee may, at Company's sole discretion, be eligible to receive a Practice Incentive Bonus, the amount of which will be allocated by the Company among the Practice's physicians in accordance with Company policies and procedures, subject to the approval of and as directed by the Board of Directors of the Company. A summary of the Practice Incentive Bonus Plan currently applicable to Employee is set forth in <u>Exhibit 1.2</u>, with such plan being subject to change without notice at the sole discretion of Company from time to time. To the extent permitted by applicable law, and unless specifically agreed to in writing between Employee and Company, Employee will not be eligible to receive any payments under the Practice Incentive Bonus Plan if as of the date of such payment (i) notice of termination of employment has been given either by Company or by Employee in accordance with Section 2.2; or (ii) Employee is no longer employed by Company for any reason.

(c) <u>No Referrals</u>. Each party represents and warrants on behalf of itself, that the aggregate benefit given or received under this Agreement, whether in cash or in kind, has been determined in advance through a process of arms-length negotiations that were intended to achieve an exchange of goods and/or services consistent with fair market value in the circumstances, and that any benefit given or received under this Agreement is not intended to induce, does not require, and is not contingent upon, the admission, recommendation or referral of any patient, directly or indirectly and further, is not determined in any manner that takes into account the volume or value of business generated between the parties.

1.3 **Working Conditions/Benefits.**

(a) <u>Vacation/Illness and CME</u>. During the Term of Employee's employment hereunder, Employee shall be entitled annually to days of vacation, sick leave, and days of Continuing Medical Education (CME) (vacation, sick leave and CME, collectively, ("**Paid Time Off**"), such Paid Time Off will be made available in accordance with Company policy and procedures as established from time to time, and are subject to change without notice at the discretion of Company. To the extent permitted by applicable law, any unused Paid Time Off shall not be carried over from year to year or paid upon termination of this Agreement.

(b) <u>Additional Benefits</u>. Employee shall be eligible to participate in and, if eligible, receive employee group medical, dental, disability, life insurance, 401(k) and such other benefits made available by the Company to similarly situated employees in accordance with the Company's policies and procedures established from time to time, and are subject to change without notice at the sole discretion of the Company.

(c) <u>Expenses</u>. Employee shall be entitled to reimbursement for all approved reasonable travel and other business expenses, including all costs associated with the maintenance of Employee's professional license, credentialing and medical staff fees incurred by Employee at the written request of the Company in connection with Employee's services to the Company hereunder. Membership fees and dues and association fees and dues are not reimbursable expenses. All business expenses for which Employee seeks reimbursement from the Company shall be adequately documented by Employee in accordance with the Company's procedures pertaining to expense reimbursement and in compliance with the regulations of the Internal Revenue Service. If Employee's employment with the Company is

3

terminated voluntarily by Employee under Section 2.2(a) or is terminated for "Cause" under Section 2.2(b) prior to the expiration of the Initial Term hereof, to the extent permitted by applicable law, Company may require Employee to reimburse Company on a pro-rata basis for fees and expenses reimbursed by or incurred with respect to Employee by Company including, without limitation, medical staff fees, licensing fees, credentialing expenses and CME reimbursement. Employee acknowledges and agrees that to the extent permitted by applicable law, such reimbursable amounts may be offset against any compensation or other monies due Employee hereunder and that such amounts may be deducted from any amounts payable to Employee, whether as salary, bonus, or otherwise.

1.4 **Professional Liability Insurance.**

(a) If Employee has engaged in the practice of medicine prior to commencing services under this Agreement, Employee represents and warrants that Employee has adequate "tail" (i.e., extended reporting) coverage in connection with and all medical and other health care related services provided by Employee prior to the Effective Date of this Agreement.

(b) The Company shall add Employee as an additional insured on the Company's professional liability insurance, for services solely related to or arising from services provided by Employee under the terms of this Agreement, contingent upon the review of Employee's prior claims history by the professional liability carrier and agreement by such carrier to add Employee at the prevailing rate for other physicians then employed by the Company or, at Company's election, if Company has established a professional liability self insurance program, Company may include Employee within such self insurance program.

(c) Tail Insurance. Upon expiration or termination of this Agreement for any reason, Company will indemnify Employee for professional liability claims, for services; (i) solely related to or arising from services provided by Employee under the terms of this Agreement, (ii) occurring during the period of employment, and (iii) reported either during the Term or after termination of employment, up to amounts provided for other physicians then employed by the Company in the Practice. Company agrees that if, for any reason, Company shall require Employee to obtain 'tail insurance' at the termination of his/her employment hereunder, Company shall pay the entire cost of such insurance.

1.5 **Compliance with Company Policy.** Employee shall at all times observe, respect and comply with the Company's policies and procedures (whether provided to Employee orally or in writing) established by the Company from time to time pertaining to the performance of Employee's duties, including but not limited to those policies set forth in the Company's Employee Handbook and the Company's Code of Conduct.

1.6 **Non-Discrimination.** Employee shall not discriminate in the treatment of patients based upon physical or medical disability, medical condition, race, color, national origin, ancestry, religion, sex, marital status, veteran status, sexual orientation, age or any other basis protected by applicable federal, state or local laws, regulations and ordinances to the extent required by such laws, regulations and ordinances. Company's non-discrimination policy is set forth in the Company's Employee Handbook. Employee shall also comply with the Facilities' non-discrimination policies.

1.7 **Duty to Report.** Employee has an affirmative duty to report to Company, in writing or through any other reporting process established by the Company in the Company Code of Conduct, any and all matters that relate to any conduct that Employee reasonably perceives as: (i) an endangerment of patient safety or Company staff or personnel by Company, its employees or its agents; (ii) a violation of law; or (iii) actual or suspected misconduct that would constitute a violation of Company's Code of Conduct. Failure to report any such matter may result in discipline of Employee, up to and including termination.

4

1.8  **Facilities Contracts and Privileges.** Employee acknowledges that Company may, from time to time, expend time and money for Employee to receive credentials at various Facilities. Employee further acknowledges that Company may, from time to time, enter into agreements with certain Facilities regarding the provision of hospitalist services (such an agreement, "**Facilities Contract**"). Employee acknowledges and agrees that each such Facilities Contract may require that Employee relinquish his or her medical staff privileges at such Facilities immediately in the event Employee's employment with Company or the Facilities Contract is terminated or otherwise expires, without entitlement to any procedural rights or remedies provided in such Facility's bylaws, the medical staff bylaws, or any applicable law or regulation. Accordingly, to the extent permitted by applicable law, Employee may be required, at the discretion of Company and Facility, to relinquish his or her medical staff privileges or other credentials at all such Facilities referenced in this Section 1.8 immediately in the event Employee's employment with the Company or, if applicable, the Facilities Contract is terminated or otherwise expires and without entitlement to any procedural rights or remedies provided in such Facility's bylaws, medical staff bylaws, or rules or any applicable law or regulation. In addition, Employee shall execute, acknowledge, and deliver such documents and instruments reasonably requested by Company consistent with the terms of this Section 1.8 or as may be required by each such Facilities Contract. The provisions of this Section 1.8 shall survive termination or expiration of this Agreement for any reason.

## ARTICLE 2
## TERM AND TERMINATION

2.1  **Term.** The term of this Agreement shall commence on the earliest practicable date after (a) the receipt by Employee of privileges at a Facility designated by the Company and (b) the Company procures professional liability insurance for Employee at the prevailing rate for other physicians employed by the Company in the Practice (the "**Effective Date**") and, unless terminated earlier in accordance with the terms of this Agreement, shall continue for a period of two (2) years (the "**Initial Term**"). Employee acknowledges that the conditions set forth in Sections 2.1(a) and 2.1(b) are conditions precedent to Company's performance under this Agreement, and prior to the Effective Date, the Company shall have no obligations to Employee under this Agreement. The term shall automatically renew and be extended for additional periods of one (1) year unless and until earlier terminated pursuant to the provisions of this Agreement. The term, as it may be renewed, is hereafter referred to as the "**Term.**"

2.2  **Termination.**

(a)  Termination Without Cause. Either party may terminate this Agreement at any time upon at least sixty (60) days' prior written notice to the other party.

(b)  Termination for Cause. Company shall have the right to terminate this Agreement at any time for Cause by giving Employee written notice of the effective date of such termination. For purposes of this Agreement, "Cause" may include, but is not limited to:

(i)  The suspension, revocation or restriction of Employee's license to practice medicine; exclusion of Employee from a Medicare or Medicaid program; or revocation or restriction of Employee's Drug Enforcement Agency number;

(ii)  The inability of Company to add or maintain Employee as an additional insured to its professional liability insurance;

5

(iii) Employee's Medical Staff privileges at any Facility are denied, modified, reduced, restricted, suspended or terminated (either voluntarily or involuntarily);

(iv) The violation by Employee of any laws, rules or regulations of any governmental or regulatory body material to the business of Company, the Practice Group or the Facility or the charge, indictment or conviction of Employee of any crime punishable as a felony, of any crime involving moral turpitude, or of any crime, the defense of which renders Employee substantially unable to perform his or her duties under this Agreement;

(v) Material failure of Employee to comply with Company's policies and procedures, including but not limited to, the failure of Employee to conduct his or her personal and professional affairs such that, in the sole discretion of Company, Employee's conduct or actions do not reflect favorably upon Company or any past or present action by Employee which, in the sole discretion of Company, causes or could reasonably cause Company to be held in disrepute or subjects Company or its affiliates to disparagement within the community or its business;

(vi) Pursuant to any applicable contractual agreement with Company, any Facility exercises its right to require Company to remove Employee from Facility's coverage schedule;

(vii) Any material breach of this Agreement by Employee;

(viii) Company makes a reasonable and good faith determination that such termination of this Agreement is reasonable in order to protect the health or welfare of patients, including, without limitation, due to Employee's unjustified failure to promptly and adequately respond while on call duty; failing to arrange for coverage of all patients under Employee's care and failure to notify Company if Employee is unable to fully render any of Employee's services

(ix) Use by Employee of alcohol or controlled substances (other than as legally prescribed for Employee by a licensed physician other than Employee) while on the job or in a manner that impairs Employee's ability to perform his/her duties; or

(x) Any fraud, misappropriation, embezzlement or other act of material misconduct by Employee against Company.

(c) Effect of Termination. In the event Employee's employment is terminated for any reason, or this Agreement expires pursuant to its terms, this Agreement shall terminate and no longer have any force or effect, except that Employee shall continue to be bound by any provisions of this Agreement that expressly survive termination of this Agreement.

## ARTICLE 3
## PROPRIETARY INFORMATION AND COVENANT NOT TO COMPETE

3.1 **Proprietary and Confidential Information.** Employee shall comply with all of the terms and conditions of the Proprietary and Confidential Information Rider attached hereto as Exhibit 3.1.

3.2 **Prior Obligations.** Employee represents and warrants that Employee has given the Company complete copies of all agreements, including without limitation, any and all confidentiality, non-competition and invention ownership agreements that might affect Employee's ability to work for the Company. Employee further represents and warrants that the terms and provisions of this Agreement will not conflict with any obligation that Employee owes any prior employer or person or

6

entity. Employee represents and warrants that Employee is free to enter into this Agreement, accept employment with the Company and perform Employee's obligations hereunder upon the terms and conditions set forth in this Agreement.

3.3 **Information of Others.** During Employee's employment with the Company, Employee will not disclose to the Company, or use, or induce the Company to use, any proprietary information or trade secrets of others. Employee represents and warrants that Employee has returned all property and confidential information belonging to all prior employers and/or any other person. Employee further represents and warrants that Employee's performance of the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by Employee in confidence or trust prior to Employee's employment with the Company. Employee has not entered into, and Employee agrees that Employee will not enter into, any oral or written agreement in conflict herewith.

3.4 **Agreement Not to Compete.** During Employee's employment by Company, Employee will be given access to and will become familiar with trade secrets, proprietary and confidential information, referral sources and customers and payors of Company (individually and collectively, "**Company Materials**"). As a material term of this Agreement, as an inducement to Company to enter into this Agreement with Employee, in order to protect Company's goodwill and Company Materials, and to further enforce the agreements and covenants contained in Exhibit 3.1 attached hereto, Employee agrees to the following:

(a) During Employee's employment hereunder and for a period of one (1) year following the last day of the Term hereof (the "**Restricted Period**"), Employee shall not directly or indirectly enter into, engage, participate or allow Employee's name to be used in or in connection with any business or activity, that is in competition in any manner whatsoever with the Hospitalist Operations of Company in the Restricted Territory (as defined in Schedule 1.1). Without limiting the foregoing, during the Restricted Period in the Restricted Territory, Employee shall not promote or assist, financially or otherwise, manage, or invest in any person, firm, association, partnership, corporation or other entity engaged in any Hospitalist Operations.

(b) By way of clarification, Employee's work after the Term as an Outpatient Primary Care Physician (as defined in Schedule 1.1) or as a specialist other than one engaged in Hospitalist Operations, whether in or out of the Restricted Territory, are not Hospitalist Operations and shall not be deemed a violation of this Agreement. Furthermore, employee shall, after the Term, ensure continuity of care for patients under Employees care on the date of termination of this Agreement. If required by applicable law, Company shall provide Employee, following the Term, with information about patients treated by Employee during the Term in a format maintained by Company, in accordance with and subject to applicable law.

(c) Employee shall be in violation of this Section 3.4, if Employee engages in any or all of the activities prohibited herein directly as an individual on Employee's own account, or indirectly as a principal, partner, joint venturer, employer, employee, agent, salesperson, consultant, member, manager, officer and/or director of any firm, association, partnership, corporation or other entity, or as a stockholder or other equity owner of any corporation or other entity in which Employee or Employee's spouse, child or parent owns, directly or indirectly, individually or in the aggregate, more than five percent (5%) of the outstanding stock or other equity interest.

(d) Employee acknowledges and agrees that the breach of the provisions of this Section 3.4 will give rise to irreparable injury to Company which cannot be adequately compensated with monetary damages. Employee acknowledges that Employee's obligations under this Agreement are reasonable in the context of the nature of Company's business and the competitive injuries likely to be sustained by Company if Employee were to violate such obligations. The protections provided by this Agreement are

7

in addition to those which may be provided by applicable law. In the event that the terms of this Section 3.4 are deemed unreasonable by an arbitrator (or court, if applicable), the parties agree and request that the arbitrator (or court, if applicable) reform the Agreement to ensure that this Section 3.4 is enforceable to the maximum extent legally possible. Employee specifically agrees that the provisions of this Article 3 shall survive the termination or expiration of this Agreement for any reason, regardless of the reason therefore or the correctness thereof.

## ARTICLE 4
## ARBITRATION OF DISPUTES

4.1 **Mutual Agreement to Arbitrate.** Unless expressly otherwise provided herein, all disputes that relate to or arise from the employment relationship between Employee and Company shall be resolved through binding arbitration on the terms and conditions set forth in this Article 4. Except as provided herein, Employee and Company each waive any right to file a lawsuit, have a trial by jury, participate as a representative or member of any class of claimants related to any claim subject to arbitration, or resolve such a dispute in any other forum. The parties understand and agree that their only remedy for any dispute covered by this Agreement shall be through binding arbitration, and that they cannot proceed with such a dispute in court or any similar forum. Nevertheless, nothing in this Agreement shall prevent Employee from filing a charge or claim with a non-adjudicatory governmental agency, including but not limited to the United States Equal Employment Opportunity Commission, the United States Department of Labor, or their state equivalents.

4.2 **Claims Covered By Agreement.**

(a) Except as provided in this Section 4.2(b) or as otherwise provided by applicable law, this Article 4 applies to any legal or equitable claim, demand, or dispute between Employee (and/or Employee's agents, administrators, or assigns) and Company (and/or Company's agents, officers, directors, partners, employees, administrators, successors, or assigns) that relates to or arises from this Agreement, the employment relationship between Employee and Company, or termination of that employment, whether based on common law or federal, state, or local law, including, without limitation: (i) claims related to Employee's employee benefits (see Section 4.2(b)(i)), compensation, wages, salary, bonuses, overtime pay, severance pay, hours of work, and leaves of absence; (ii) claims related to discrimination or harassment based on sex, race, color, religion, national origin, disability, age or other category protected by applicable law (see Section 4.2(b)(ii)); (iii) claims for breach of contract, defamation, public policy tort, infliction of emotional distress, wrongful or retaliatory discharge, negligent hiring, negligent retention or supervision, outrageous conduct, fraud, or misrepresentation; or (iv) civil claims for theft, embezzlement, nonpayment of debts, or breach of fiduciary duty.

(b) Notwithstanding the provisions of Section 4.2(a):

(i) Claims by Employee relating to employee benefits under any of Company's insurance, disability, or retirement plans must be raised with the administrator of the relevant plan pursuant to the terms of that plan. If the matter is not resolved under the procedures described in the relevant plan, Employee may pursue arbitration as described in this Agreement.

(ii) Claims by Employee of discrimination or harassment based on sex, race, color, religion, national origin, disability, age or other category protected by applicable law should be raised with Company pursuant to the procedures described in Company's Policy Against Discrimination and Harassment. Any matter not resolved to Employee's satisfaction under those procedures may be pursued in arbitration as described in this Agreement.

8

Asbahi, Redwan MI FT Agreement, v-1

Issued: 5/24/16 ASD: 7/1/16

(iii) This Article 4 does not apply to: (A) claims by Employee for workers' compensation benefits or unemployment compensation benefits or (B) claims by either Company or Employee for provisional relief or interim measures (such as a preliminary injunction or temporary restraining order) related to unauthorized disclosure of confidential information, misappropriation or disclosure of trade secrets or intellectual property, unfair competition, or competition or solicitation in violation of Article Three or Exhibit 3.1. In connection with such claims, each party shall bear their own costs and expenses (including, without limitation, attorneys' fees and costs).

4.3 **Applicable Law and Rules.** Arbitration shall be conducted in accordance with the Federal Arbitration Act (FAA) and the National Rules for the Resolution of Employment Disputes (the "**Rules**") of the American Arbitration Association ("**AAA**") which are then in effect. The matter shall be heard and determined by one arbitrator mutually selected by the parties as set forth in the Rules. The arbitration shall take place in the city where Employee performs or performed the majority of services for Company or another location if mutually agreed upon by Company and Employee. The law of the State (as defined in Schedule 1.1) and any applicable federal law, as applicable, shall govern the dispute. The arbitrator shall have the authority to order any remedies, legal or equitable, which a party could obtain from a court of competent jurisdiction based on the claims asserted (except attorneys' fees and costs), and nothing more; provided, however, there shall be no authority for a dispute to be arbitrated on a class action basis, nor shall consolidation or joinder with the claims of another person be permitted. The arbitrator shall prepare a written decision setting forth his or her findings of fact and law. Subject to the FAA and other applicable law, the arbitrator's award shall be final and binding, without right of appeal. Any party may seek to have judgment entered upon the award by a court of competent jurisdiction.

4.4 **Procedures and Costs.**

(a) A party seeking arbitration must: (i) deliver a written demand for arbitration and the applicable filing fee to the regional office of the AAA closest to the city in which the executive director for the Practice is located and (ii) on the same day, send a copy of that demand to the other party in accordance with Section 5.1. In accordance with the Rules, the demand must describe all claims the party seeks to arbitrate. A demand to arbitrate a claim must be received by the AAA and the other party within the applicable statute of limitations governing that claim, or the party seeking arbitration will be barred from pursuing that claim.

(b) Unless otherwise required by applicable law, if Employee seeks arbitration, Employee and Company will each bear one-half of the cost of the applicable filing fee, and once Employee demands arbitration and pays the entire filing fee, Company shall reimburse Employee for one-half of that amount within fifteen (15) days after receiving the demand. If Company seeks arbitration, it will be responsible for paying the entire applicable filing fee.

(c) Except as set forth in Section 4.4(b) above, and unless otherwise permitted by applicable law and ordered by the arbitrator, Company shall pay all fees and expenses of the arbitrator and any AAA fees associated with the arbitration; provided, however, that Employee shall be solely responsible for any fees incurred as a result of Employee's unilateral request for postponement or cancellation of any hearing. Each side to the claim or dispute shall pay the fees and expenses of its or his or her own attorneys.

4.5 **Confidentiality.** Everything related to the arbitration proceeding, including, without limitation, discovery, the hearing, the record of the proceeding, and all communications and correspondence regarding the arbitration, are confidential and shall not be open or disclosed to any third party or the public except to the extent both parties agree otherwise in writing, to the extent required in

9

Asbahi, Redwan MI FT Agreement, v-1

Issued: 5/24/16 ASD: 7/1/16

any other proceedings between the parties, or to the extent required in response to a governmental agency or legal process.

4.6  **Waiver.** Company may waive its right to require Employee to arbitrate a claim initiated by Employee that would otherwise be covered by this Agreement. Company may waive its right to require an Employee to share in the filing fee expense, as described in Section 4.4(b). In either case, such a waiver shall not be deemed a waiver or relinquishment of Company's right to enforce those rights against Employee in the future or any other employee of Company.

## ARTICLE 5
## MISCELLANEOUS

5.1  **Notices.** Any notice or other document to be given hereunder shall be in writing and shall be delivered personally or sent by United States registered or certified mail, return receipt requested, postage prepaid, by Federal Express or other reputable overnight courier, or by facsimile (with confirmation of receipt), and addressed to the parties at the respective numbers and/or addresses set forth herein, and the same shall be deemed given and effective (i) upon receipt or refusal if delivered personally or by hand delivered messenger service, (ii) the date received or refused if sent by Federal Express or other reputable overnight courier, (iii) the date received, refused or returned to sender as undeliverable if mailed by United States registered or certified mail, return receipt requested, postage prepaid, and (iv) the date received if sent by facsimile. A party may change its address for receipt of notices by service of a notice of such change in accordance herewith. The initial address for Employee shall be as set forth on the signature page and for Company shall be as set forth below.

To Company:

c/o IPC Healthcare, Inc.
4605 Lankershim Boulevard, Suite 617
North Hollywood, CA 91602
Attention: [President]
Facsimile: (818) 766-3999

5.2  **Assignment.** Company may assign its interest in this Agreement to any subsidiary or affiliate of Company or in connection with a merger or sale, transfer or other disposition of all or substantially all of the assets or equity of Company. Employee may not assign or transfer this Agreement, it being deemed personal to Employee only; provided, however, upon Employee's death, Employee's heirs, executors and/or administrators may seek collection of any sums that may have been due Employee as of Employee's death. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and the heirs, executors, administrators, legal representatives, successors and assigns as permitted by this Section 5.2.

5.3  **Deductions; Cancellation of Debt Income.** Company shall deduct from any payment to Employee hereunder such income tax withholding and other deductions, if any, as required by this Agreement and as Company shall reasonably determine to be required by applicable law. Employee acknowledges that cancellation of any debt to Company, including failure to repay any advances, may result in taxable income to Employee.

5.4  **Severability.** If any term or provision of this Agreement, or the application thereof to any person or circumstance, shall to any extent be found to be invalid, void, or unenforceable, the remaining provisions of this Agreement and any application thereof shall, nevertheless, continue in full force and effect without being impaired or invalidated in any way.

5.5 **Waiver; Amendment.** This Agreement may not be amended, modified or discharged nor may any of its terms be waived except by an instrument in writing signed by each of the parties hereto. No waiver of any term, provision or condition of this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition or as a waiver of any other term, provision or condition of this Agreement.

5.6 **Headings.** The headings herein used are for convenience purposes only and shall not be used to construe the meaning of this Agreement in any respect.

5.7 **Entire Agreement.** Employee acknowledges and agrees that no promises or representations were made to Employee that are not written in this Agreement and that this Agreement contains the entire agreement of the parties as to the subject matter herein, superseding any previous or contemporaneous oral or written communications, representations, understandings or agreements with the Company or any official or representative thereof.

5.8 **Governing Law.** The validity, interpretation and construction of this Agreement, and all other matters related to this Agreement, shall be interpreted and governed by the laws of the State of Michigan.

5.9 **Counterparts.** This Agreement may be executed in several counterparts, each of which when so executed shall be deemed to be an original, and such counterparts shall together constitute and be one and the same instrument.

5.10 **Fax Copies, Photocopies, Scanned Copies.** Fax copies, photocopies or scanned copies of this signed Agreement are as binding and legally enforceable as a signed original.

5.11 **Survival.** The parties specifically agree that, in addition to the other provisions of this Agreement which expressly survive the termination or expiration of this Agreement, the provisions of Articles 4 and 5 shall survive the termination or expiration of this Agreement for any reason, regardless of reason therefor or the correctness thereof.

5.12 **Interpretation.** No provision of this Agreement is to be interpreted for or against either party because that party or that party's legal representative drafted such provision.

*Signatures follow on next page*

Asbahi, Redwan MI FT Agreement, v-1

Issued: 5/24/16 ASD: 7/1/16

IN WITNESS WHEREOF, the parties hereto have read, understood, and executed this Agreement (including, without limitation, ARTICLE 4 regarding Arbitration of Disputes), as of the date first above written, by their duly authorized representatives.

COMPANY:      INPATIENT CONSULTANTS OF MICHIGAN, P.C., A MICHIGAN PROFESSIONAL CORPORATION

By: *R. Jeffrey Taylor* (DocuSigned by: 5C11D53351F74D1...)

R. Jeffrey Taylor
Authorized Officer

Date: June 17, 2016 | 12:58 PDT

EMPLOYEE:

By: _____
Redwan Asbahi, MD

Date: 5/26/16

Address for Employee:

7390 Rafford Lane
West Bloomfield, MI 48322

## SCHEDULE 1.1

A. **"Facility"** or **"Facilities"** shall mean short-term and long-term acute care hospitals, skilled nursing facilities, nursing homes, assisted living facilities, adult care homes, hospices and other related settings.

B. **"Hospitalist Operations"** shall mean any of the following: (i) the arranging for and/or the provision of Facilities-based medical care and associated services on a referral or consulting basis for patients of other Providers or for patients who do not have a primary care physician, while such patients are in Facilities; (ii) the arranging for and/or provision of more than a Provider's pro rata share of emergency room or department call coverage at a Facility if a Provider is required to provide such coverage by the Facility's medical staff bylaws, policies, or procedures generally applicable to members of such Facility's medical staff; (iii) the arranging for and/or provision of medical care and associated services by a Provider for patients in a skilled nursing facility or nursing home where such Provider is acting as a primary care physician; (iv) the arranging for and/or provision of emergency room or department call coverage at a Facility which does not require such coverage by its medical staff bylaws, policies, or procedures.

C. **"Outpatient Primary Care Physician"** shall mean a primary care physician who follows and treats only his or her patients in an outpatient office, follows only his or her patients from the outpatient office into Facilities, and provides no more than his or her pro-rata share of emergency room or department coverage at a Facility if required to provide such coverage by the Facility's medical staff bylaws, policies, or procedures generally applicable to members of such Facility's medical staff.

D. **"Practice"** shall be determined from time to time by Company in its sole discretion. Initially, the Practice shall be the Michigan Harper practice area.

E. **"Restricted Territory"** shall mean (i) those Facilities from or at which Employee has provided services on behalf of Company; (ii) any Facilities at which Company has paid or arranged for Employee to be credentialed, obtain privileges or join the medical staff; and (iii) the areas in a ten (10) mile radius around each of the Facilities in clauses (i) and (ii).

F. **"State"** shall mean Michigan.

G. **"State Authority"** shall mean the Michigan Department of Community Health, Bureau of Health Professions, the Michigan Board of Medicine, and the Michigan Board of Osteopathic Medicine & Surgery.

H. Notwithstanding anything to the contrary in this Agreement, throughout this Agreement the following terms have the special definitions as noted: "includes" shall be deemed to mean "includes, without limitation," "including" shall be deemed to mean "including, without limitation," "terminated" shall be deemed to include "expired" and "not renewed," and "termination" shall be deemed to include "expiration" and "non-renewal."

## SCHEDULE 1.2

Employee shall be entitled to receive a Base Salary of One Hundred Eighty Thousand Dollars ($180,000) per annum for Employee's services as a full-time hospitalist during the Term. Such Base Salary includes all sums payable to Employee by Company for providing services on behalf of Company, except for any amounts payable to Employee for approved reimbursements and any amounts Employee may earn, if eligible, under the Practice Incentive Bonus Plan each in accordance with this Agreement.

The amount of payments, if any, under the Practice Incentive Bonus Plan which Employee shall be able to receive shall be 100% of the incentive amount determined by the Board of Directors, from time to time during the Term.

## EXHIBIT 1.2

## SUMMARY OF PRACTICE INCENTIVE BONUS PLAN

- The Practice Incentive Bonus Plan is based on the financial performance of each practice (POD) and is currently based on a 70/30 split of the revenue generated by the practice; on a monthly or quarterly basis.
- The individual patient revenue generated by each eligible physician is allocated to each such physician within the practice group; less the 30% allocated to Company.
- Each physician is allocated his/her direct expenses (salary, benefits) and an equal share of the practices' group shared revenue and shared expenses.
- Shared revenue includes, but is not limited to, hospital contract payments, ER coverage payments, moonlighter billing and other revenue generated by the practice. Shared expenses include, but are not limited to: extender expenses; moonlighter revenue/expenses; malpractice; taxes; 401k match; Company paid health insurance premiums; cell phones; pagers; answering service; credentialing costs; immigration-related legal costs; relocation; licenses and other fees; business cards; etc.
- For each eligible physician, direct and shared expenses are subtracted from such physician's patient revenue and any remaining balance is identified as profit. If all physicians in the practice are profitable including the deduction of shared expenses, then each eligible physician receives their individual profit as a monthly/quarterly bonus payment. However, if any physician in the practice group generates a loss (expense is greater than the revenue), that loss will be proportionately absorbed from the bonuses generated by profitable physician(s); thus reducing their bonuses accordingly. The physician incurring the loss may not receive any bonus for the month/quarter.
- In order for a physician to receive his/her monthly/quarterly bonus, he/she must be a member in good standing with the Company and the practice group (which includes fulfillment of all Company orientation requirements and compliance with all timely discharge notice and billing requirements) and not in a notice of termination period.
- Participation in the Practice Incentive Bonus Plan may be subject to a vesting schedule.

The above is a summary of the Practice Incentive Bonus Plan is not a guarantee of payment. The Practice Incentive Bonus Plan may be modified without notice at the sole discretion of Company.

Exhibit 3.1

## PROPRIETARY AND CONFIDENTIAL INFORMATION RIDER

A.   Company's Proprietary, Confidential and Trade Secret Information: Employee acknowledges that during Employee's employment with Company, Employee may have access to or otherwise obtain knowledge of confidential information of Company and/or its affiliates (whether such affiliation is through a management agreement between Company and/or another entity or otherwise) ("**Affiliates**"), including, without limitation, Company's and Affiliates' selling and servicing methods and business techniques, software programs, policies and procedures, business records, training, service and business manuals, promotional materials, training courses and other training and instructional materials, vendor and product information, customer and prospective customer lists, other customer and prospective customer information, information concerning Company's and Affiliates' current or any future or proposed work, services, or products, the facts that any such work, services, or products are planned, under consideration, or in production, as well as any descriptions thereof, and other business information ("**Confidential Information**"). Confidential Information shall not include information that Employee can demonstrate: (i) was publicly available at the time of disclosure, or later became publicly available through no act or omission of the Employee; (ii) was rightfully in Employee's possession prior to Employee's date of employment by Company; or (iii) was rightfully received by Employee from a third party without any obligation of confidentiality. Capitalized terms not defined in this Proprietary and Confidential Information Rider shall have the meaning given to them in the agreement to which this Proprietary and Confidential Information Rider is attached (the "**Agreement**").

Employee acknowledges that (a) all such Confidential Information, whether reduced to writing, maintained on any form of electronic media, or maintained in the mind or memory of Employee and whether compiled by Company, its Affiliates and/or Employee, derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from its disclosure or use; (b) reasonable efforts have been made by Company and its Affiliates to maintain the secrecy of such information; (c) all Confidential Information and materials have and will be made available to Employee only for the limited purpose of the performance of Employee's duties as an employee; (d) all Confidential Information of Company and its Affiliates has been developed or compiled by Company and its Affiliates through substantial expenditures of time, effort and money and constitutes valuable and unique property of Company and its Affiliates; and (e) all Confidential Information and materials are the sole property of Company or its Affiliates. Any retention and use of such information by Employee during Employee's employment with Company (except in the course of performing Employee's duties and obligations hereunder) or after the termination of Employee's employment shall constitute a misappropriation of Company's trade secrets and Confidential Information and unfair competition.

Company's and its Affiliates' business is the development and implementation of programs for the management of comprehensive hospital-based care for patients within structural in-patient programs, the provision of hospitalist and associated services throughout the United States and the development and utilization of automated and electronic work tools and processes for hospital-based healthcare providers. Employee acknowledges and agrees that the development of relationships between Company or its Affiliates and its customers and clients entails great expense and difficulty and requires frequent personal contact with such customers and clients, that the development of Company's and its Affiliates' staff and employees entails great difficulty and expense and extensive training and supervision of such staff and employees, and that but for Employee's employment by Company, Employee would have no contact with or knowledge of the identities, addresses and other contact information pertaining to Company's or its Affiliates' customers, clients, staff, or other employees, all of which constitute part of Company's and its Affiliates' Confidential Information.

Accordingly, and without diminishing in any way the rights and remedies of Company under any applicable law and regulation, Employee will keep in strict confidence, and will not, directly or indirectly, at any time during or after Employee's employment with Company, disclose, furnish, disseminate, make available or, except in the course of performing Employee's duties of employment, use any Confidential Information or other trade secrets or confidential business and technical information of Company or its Affiliates.

Employee expressly authorizes Company to notify any person, firm, entity, hospital, medical group, medical provider or corporation employing Employee in the future, or evidencing an intent to employ Employee in the future, of the existence and provisions of this Agreement.

Employee acknowledges that Employee's use of Confidential Information regarding Company accounts, clients, customers, staff and/or employees by Employee during or after the Term of Employee's exclusive and non-exclusive employment by Company or consultation with Company, except as is necessary in the course and scope of performing Employee's job duties for Company, will materially and adversely affect Company, and all of its shareholders, economically and otherwise, and constitutes unfair competition. Accordingly, as an additional inducement to Company to enter into the Agreement with the Employee, Employee agrees that:

(1) During and after the Term of Employee's exclusive or non-exclusive employment by Company or consultation with Company, except as is necessary in the course and scope of performing Employee's job duties for Company, Employee will not use Company's trade secrets or Confidential Information, directly or indirectly, alone or in concert with any person or entity, for Employee's own account or for, or on behalf of, any other person or entity, to solicit any business from accounts, clients or customers of Company or its Affiliates who have dealt with Company or its Affiliates at any time during the Term; provided, however, Employee may, following the termination of employment with Company, accept as a patient anyone to whom Employee provided medical services during the Term who affirmatively requests that Employee continue to provide such medical services and is not, directly or indirectly, solicited by Employee or any other person.

(2) During the Term and for a period of two (2) years following expiration or termination of the Term, regardless of the reason for the termination, Employee will not directly or indirectly solicit or induce or attempt to solicit or induce any officer, director, employee, sales representative, agent or consultant of Company or its Affiliates to terminate or adversely alter their employment, representation or other association with Company or its Affiliates. In addition, at no time after Employee leaves employment with Company will Employee seek to obtain or misappropriate any of Company's trade secrets or Confidential Information from any current or former Company employee or consultant.

(3) In the event that Employee is requested or required in any legal or governmental authority proceeding to disclose any Confidential Information, Employee shall: (i) provide Company with prompt written notice of such request(s) and the documents or information requested so that Company or its Affiliates may seek an appropriate protective order and/or waive Employee's compliance with the provisions of this Proprietary and Confidential Information Rider; and (ii) consult with Company or its Affiliates as to the advisability of taking legally available steps to resist or narrow such request. It is further agreed that, if in the absence of a protective order or the receipt of a written waiver from Company or its Affiliates, the Employee is nonetheless, in the written opinion of its legal counsel, compelled to disclose any of the Confidential Information or else stand liable for contempt or suffer other censure or penalty, Employee agrees to disclose to such tribunal only such Confidential Information as is legally required, which disclosure shall be without liability hereunder; provided, however, that Employee shall give Company written notice of the Confidential Information to be so disclosed as far in advance of its disclosure as is practicable and Employee shall request, from the parties to whom the Confidential Information is disclosed, assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed as Company or its Affiliates designates.

B.   Employee's Return of Property: Employee agrees that upon termination of Employee's employment with Company, for any reason, Employee shall promptly return to Company, in good condition, all property of Company or its Affiliates, including, without limitation, the originals and all copies of any materials which contain, reflect, summarize, describe, analyze or refer or relate to any Confidential Information. In the event that such items are not so returned, Company or its Affiliates will have the right to charge Employee for all reasonable damages, costs, attorneys' fees and other expenses incurred in taking, removing and/or recovering such property. Moreover, to the extent that Confidential Information resides with Employee in such a form that it cannot be returned (e.g., a copy of the Confidential Information exists on Employee's home computer), Employee shall destroy or erase such Confidential Information and certify in writing to Company that such has been done.

C.   Works for Hire/Assignment of Inventions:

(1) Works for Hire. The term "Works for Hire" means any and all work product, including, but not limited to, reports, programs, technical data, flow charts, research notes, manuals, listings, and any other programming documentation, sales proposals, customer, client or prospect lists or sales reports prepared by Employee, alone or with others, during the term of Employee's employment and in the performance of services connected with Employee's employment. Employee understands and agrees that all Works for Hire are the sole and exclusive property of Company.

(2) Inventions. Employee hereby assigns and agrees to assign to Company, its Affiliates, successors, assigns or nominees, all of Employee's right, title and interest in and to any and all "Inventions," which include any and all discoveries, developments, designs, inventions, improvements, processes, techniques, business records, software programs, training, service and business manuals, promotional materials, training courses and other results and proceeds of Employee's services, regardless of whether subject to patent, registration, trade mark or copyright protection or protection under similar statutes, made, conceived, suggested, either solely or jointly with others, by Employee while in Company's employ, whether in the course of employment with the use of Company's time, material or facilities or that is in any way within or related to the existing or

16

Asbahi, Redwan MI FT Agreement, v-1                                                                                                                                                                Issued: 5/24/16 ASD: 7/1/16

contemplated scope of Company's or its Affiliates' business or result from the use of property owned, leased or contracted for by Company. Inventions shall also include anything that derives actual or potential economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use. Any Inventions directly derivative of Company's or its Affiliates' planned or existing products or services, developed or under development during Employee's employment and made, conceived or suggested by Employee, either solely or jointly with others, within one (1) year following termination of Employee's employment under the Agreement, or any successor agreement shall be irrefutably presumed to have been so made, conceived or suggested in the course of such employment with the use of Company's time, materials and/or facilities. All work papers, reports, documentation, drawing, photographs, negatives, tapes and masters therefor, prototypes, other tangible items and materials, and all other results and proceeds of Employee's services hereunder, made, conceived, or suggested, either solely or jointly with others, by Employee while in Company's employ, whether in the course of employment with the use of Company's time, material or facilities or in any way within or related to the existing or contemplated scope of Company's or its Affiliates' business, including, without limitation, such results and proceeds directly derivative of Company's or its Affiliates' planned or existing products or services, developed or under development during Employee's employment and made, conceived or suggested by Employee, either solely or jointly with others, within one (1) year following termination of Employee's employment under the Agreement or any successor agreements, and including, without limitation, any and all such items generated and maintained on any form of electronic media, constitute specially commissioned works made for hire as defined in the United States Copyright Act, which works and the copyrights therein and thereto shall be the property of Company or its Affiliates as the author thereof. To the extent that California law applies to the Agreement, this paragraph does not apply to any invention that qualifies fully under the provisions of Section 2870 of the California Labor Code, the text of which is reproduced below, and Employee agrees and acknowledges that Employee will bear the full burden of proving to Company that an Invention qualifies fully under Section 2870.

(3) The text of California Labor Code Section 2870 is as follows: "(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either: (1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) Result from any work performed by the employee for the employer; and (b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

(4) Upon request by Company with respect to any such Inventions, Employee agrees to execute and deliver to Company, at any time during or after Employee's employment, such further documents as Company may require in connection with the rights, privileges and property granted to Company or its Affiliates in this Section C (the "Rights"), when so requested, at the expense of Company, but without further or additional, consideration. In the event Company is unable, after reasonable effort, to secure Employee's signature on any document(s) required in accordance with the provisions of the Agreement, including, without limitation, with respect to this Proprietary and Confidential Information Rider, Employee irrevocably designates Company or its Affiliates, or their nominee, as Employee's agent or attorney-in-fact to act on Employee's behalf, with the right, but not the obligation, to execute and deliver all such further documents for the purposes aforesaid. Employee also irrevocably designates Company or its Affiliates, or their nominee, as Employee's agent or attorney-in-fact, with the right but not the obligation, for the sole benefit of Company or its Affiliates, and at Company's or its Affiliates' expense, to bring, prosecute, defend and appear in suits, actions, and proceedings of any nature under or concerning all such Rights; and to take such action as Company or its Affiliates may deem advisable to enforce, protect, and/or defend any of the Rights; and to litigate, collect and receipt for all damages arising from any infringement of any such Rights. Any such action may be taken by Company or its Affiliates in the name of Employee or otherwise, and Company or its Affiliates may join Employee as a plaintiff or defendant in any such suit, action or proceeding.

Employee further acknowledges that the foregoing assignment of rights is made in consideration of, and is adequately supported by good, valuable and sufficient consideration including but not limited to the agreement of Company to employ Employee.

D. Employee shall not disclose the terms and conditions of the Agreement to any third party, except to Employee's attorneys, accountants and other advisers (after first instructing said person that same constitutes Confidential Information and trade secrets and securing said person's irrevocable written promise not to disclose same), to the extent Employee may be required to do so in connection with customary disclosures in the ordinary course of business, as, for example, in regard to loan applications, and by judicial process.

E. Employee acknowledges and agrees that the provisions of this Proprietary and Confidential Information Rider are reasonable and necessary to protect the legitimate professional and business interests of Company and its Affiliates and that any breach or violation hereof would result in irreparable damage and injury to Company or its Affiliates with the extent and the amount of the damages and injury being difficult, if not impossible, to ascertain. Employee acknowledges and agrees that such damages and injury cannot be adequately compensated with monetary damages, and Employee further agrees that Company or its Affiliates may seek and obtain injunctive relief against the breach or threatened breach of any of the provisions of this Proprietary and Confidential Information Rider and/or specific enforcement of such provisions in addition to any other legal or equitable remedies which may be available and Employee agrees to waive any requirement for the securing or posting of any bond in connection with such remedy. Should arbitration or litigation be instituted to enforce any provision hereof, the prevailing party will be entitled to recover all costs, including without limitation reasonable legal fees, cost of investigation and cost of settlement.

F. Employee acknowledges and agrees that Employee's obligations under this Proprietary and Confidential Information Rider are reasonable in the context of the nature of Company's and its Affiliates' business and the competitive injuries likely to be sustained by Company or its Affiliates if Employee were to violate such obligations. Employee further acknowledges that the Agreement is made in consideration of, among other things, this Proprietary and Confidential Information Rider and is adequately supported by good, valuable and sufficient consideration, including but not limited to the agreement of Company to employ Employee. Employee specifically agrees that the provisions of this Proprietary and Confidential Information Rider shall survive the termination or expiration of the Agreement.

Asbahi, Redwan MI FT Agreement, v-1                                                                                              Issued: 5/24/16 ASD: 7/1/16