## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

THE UNITED STATES OF
AMERICA AND THE STATE OF
MICHIGAN ex rel. AMINE P.
AMINE, M.D., individual, REDWAN
ASBAHI, M.D.,

      Plaintiffs,

v.

TEAM HEALTH HOLDINGS INC. a
TENNESEE COMPANY, and
MAHMUD ZAMLUT, M.D.,

      Defendants.

Case No. 2:21-cv-10799
Hon. Matthew F. Leitman

_____

## PLAINTIFFS' RESPONSE TO DEFENDANT TEAM HEALTH HOLDINGS, INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT WITH PREJUDICE

## TABLE OF CONTENTS

INDEX OF AUTHORITIES …………………….…...……………….………..iii

CONTROLLING AUTHORITY ………………………………………….....vi

COUNTER-STATEMENTS OF ISSUES PRESENTED ……………….…...vii

INDEX OF EXHIBITS ……………………………………….....………....viii

COUNTER-STATEMENT OF MATERIAL FACTS ……………….....….….…1

    1. The Amine Complaint …………………………………………….…………1
    2. The Saad Complaint ………………………………………….……………1
    3. Partial Settlement of the Amine and Saad Claims ………….……………2

STANDARD OF REVIEW ……………….………………………….…………5

LEGAL ARGUMENT ……………….………………………….…............6

    1. Counts I, II, IV and V Have Not Been Resolved and are Valid Claims…6

    2. Relators Have Asserted Valid Claims for Fraud Claims Against Team Health Pursuant to Fed. R. Civ. P. 9(b)…………………………………..9

    3. Relators Can Pursue AKS Claims Against TH if Brought Under the FCA……………………………………………………………………..15

    4. Count VIII Asserts a Valid Retaliation Claim Against Team Health……18

    5. TH is Properly Before the Court Pursuant to § 3730(h)(1)………………21

    6. All Statute of Limitations Claims Including Those Opposing Retaliation Claims Raised by TH should be Denied Based on Facts Pled by Relators and Alternatively Based on the FRCP 15(c)2…………………………26

CONCLUSION ……………………………………………………….………………30

# INDEX OF AUTHORITIES

<u>Cases</u>

*AFSCME Council 25 v Wayne County*,
  292 Mich App 68 (2011) ........................................................................ 6
Amini v. Oberlin Coll.,
  259 F.3d 493 (6th Cir. 2001) ................................................................. 5
*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................................. 6
*Bassett v. Nat'l Collegiate Athletic Ass'n*,
  528 F.3d 426 (6th Cir. 2008) ................................................................. 8
*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................. 6
*U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*
  501 F.3d 493, 503 (6th Cir. 2007) ........................................................ 18
*U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*
  342 F.3d 634 (6th Cir. 2003) ................................................................. 31
*Brown v. Shaner*,
  172 F.3d 927 (6th Cir.1997) .................................................................. 29
*Carnithan v. Cmty. Health Sys., Inc.*,
  2015 WL 9258595 (S.D.Ill. Dec. 18, 2015) ......................................... 22
*Dominguez v. Miller*,
  51 F.3d 1502 (9th Cir.1995) .................................................................. 30
*Dye v. Office of the Racing Comm'n*,
  702 F.3d 286 (6th Cir.2012) .................................................................. 27
*EEOC v Waffle House, Inc*,
  534 US 279 (2002) ................................................................................ 6
*Michaels Bldg. Co. v. Ameritrust Co., N.A.*,
  848 F.2d 674 (6th Cir.1988) ..............................................................11, 12
*Miller v. Am. Heavy Lift Shipping*,
  231 F.3d 242 (6th Cir.2000) .................................................................. 30
*Price v. O'Donnell*,
  2019 WL 5290809 (E.D. Mich. Sept. 27, 2019)................................. 5, 8
*Sanford v. Main St. Baptist Church Manor, Inc.*,
  449 Fed.Appx. 488 (6th Cir.2011) ....................................................... 25
*Santamarina v. Sears, Roebuck & Co.*,
  466 F.3d 570 (7th Cir.2006) .................................................................. 30
*Scott v. Metro. Health Corp.*,
  234 F. App'x 341 (6th Cir.2007)............................................................ 26

*Swierkiewicz v. Sorema N.A.*,
   534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)............................................11
*Tibor v. Mich. Orthopaedic Inst.*,
   72 F.Supp.3d 750 (E.D.Mich.2014) ...................................................... 22
*U.S. ex. rel. Marlar v. BWXT Y–12, L.L.C.*,
   525 F.3d 439 (6th Cir.2008) ...................................................... 26, 27
*U.S. ex rel. Pogue v. Am. Healthcorp, Inc.*,
   914 F. Supp. 1507 (M.D. Tenn. 1996)...................................................... 16
*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
   20 F.Supp.2d 1017 (S.D.Tex.1998)...................................................... 16
*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
   125 F.3d 899 (5th Cir. 1997) ...................................................... 16
*United States ex rel. Joshi v. St. Luke's Hosp., Inc.*,
   441 F.3d 552 (8th Cir. 2006) ...................................................... 9
*United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*,
   838 F.3d 750 (6th Cir. 2016) ...................................................... 14, 18
*United States ex rel. Rahimi v. Rite Aid Corp.*,
   2019 WL 10374285 (E.D. Mich. Dec. 12, 2019)...................................................... 5, 6
*United States ex rel. Williams v. Bell Helicopter Textron Inc.*,
   417 F.3d 450, (5th Cir.2005) ...................................................... 9
*United States v. Robert E. Solinger*,
   457 F.Supp 2d (October 12, 2006) ...................................................... 9, 16
*Vander Boegh v. EnergySolutions, Inc.*,
   772 F.3d 1056 (6th Cir.2014) ...................................................... 22
*Vander Boegh v. Energysolutions, Inc*,
   772 F. 35, 1056 ...................................................... 23, 24
*Welch v. Decision One*,
   2012 WL 4008730 (E.D. Mich. June 25, 2012)...................................................... 5
*West Allis Mem'l Hosp., Inc. v. Bowen*,
   852 F.2d 251 (7th Cir.1988) ...................................................... 16

## Statutes

31 U.S.C.A. § 3730(h)(1)...................................................... 28
42 U.S.C. 1320a-7b...................................................... 15
Pub. L. 111–21, 123 Stat. 1617 ...................................................... 22

Rules

Fed. R. Civ. P. 9(b) ................................................................................... Passim
Fed. R. Civ. P. 12(b)(6) ....................................................................................... 5
Fed. R. Civ. P. 8 ..................................................................................................11
Fed. R. Civ. P. 15(a)(2) ...................................................................................... 30
Fed. R. Civ. P. 15(c)(2) ...................................................................................... 28
Fed. R. Civ. P. 8(a) .............................................................................................11
Fed. R. Civ. P. 9(b) ................................................................... 9, 11, 12, 17, 18
Fed. R. Civ. P. 15(c)(2) ...................................................................................... 29

Other Authorities

155 Cong. Rec. E1295–03, 2009 WL 1544226 ..................................................... 24
S.Rep. No. 110–507 ............................................................................................ 24
The False Claims Act: Fraud Against the Government § 5:1 ................................ 22

## <u>STATEMENT OF CONTROLLING AUTHORITY</u>

Pursuant to Local Rule 7.1(b), the controlling or most appropriate authorities for the relief sought herein, in addition to FRCP 8, 9 and 12(b)(6), are:

1. As to Relators' Fraud Claims: 31 U.S.C. § 3729(a); MCL 400.601–400.615; *FSCME Council 25 v Wayne County*, 292 Mich App 68 (2011); *EEOC v Waffle House, Inc*, 534 US 279 (2002); *United States v. Robert E. Solinger*, 57 F.Supp 2d 743 (October 12, 2006); *United States ex rel. Williams v. Bell Helicopter Textron Inc.,* 417 F.3d 450 (5th Cir.2005);  *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674 (6th Cir.1988); *United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 838 F.3d 750 (6th Cir. 2016)

2. As to Relators' AKS Claims: 42 U.S.C. § 1320a-7(b); 42 U.S.C. § 1320a-7(b)(1); *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F.Supp.2d 1017 (S.D.Tex.1998) ("Thompson II"); *U.S. ex rel. Pogue v. Am. Healthcorp, Inc*., 914 F. Supp. 1507 (M.D. Tenn. 1996); see also U.S. ex rel. *Thompson v. Columbia/HCA Healthcare Corp*., 125 F.3d 899 (5th Cir. 1997)

3. As to Relators' Retaliation Claims: 31 U.S.C. 3730(h)(1); *Tibor v. Mich. Orthopaedic Inst*., 72 F.Supp.3d 750 (E.D.Mich.2014); *Sanford v. Main St. Baptist Church Manor, Inc*., 449 Fed.Appx. 488 (6th Cir.2011)

## <u>COUNTER-STATEMENT OF QUESTIONS PRESENTED</u>

I.   Were any of Relators Claims released under the *Saad* Partial Settlement Agreement

>   Plaintiffs answer: No.

>   Defendants answer: Yes.

>   The Court should answer: No.


II.  Were any of Relators Claims released under the *Amine* Partial Settlement Agreement?

>   Plaintiffs answer: Yes, but only "ghost rounding" claims from January 1, 2019, through June 30, 2023.

>   TH Defendants answer: Yes.

>   The Court should answer: Yes, but only "ghost rounding" claims from January 1, 2019, through June 30, 2023.


III. Do the Relators plead legally viable claims under the Anti-Kickback Statute?

>   Plaintiffs answer: Yes.

>   TH Defendants answer: No.

>   The Court should answer: Yes.


IV.  Was Defendant the employer of Relators and did the Relators plead a legally viable claim for retaliation?

>   Plaintiffs answer: Yes to both questions.

>   TH Defendants answer: No to both questions.

>   The Court should answer: Yes to both questions.

# <u>INDEX OF EXHIBITS</u>

Exhibit 1 – Saad Complaint……………………………………………………1

Exhibit 2 – A*mine* Agreement……………………………………………1

Exhibit 3 – *Saad* Agreement……………………………………………1

Exhibit 4 – Civil Investigative Demand ("CID") Email ………..…………13

Exhibit 5 – Donna Parker Email…………………………………………20

Exhibit 6 – Evans Team Health's Human Resources………………………20

Exhibit 7 – Team Health's Countersigns HMST contract…………………20

Exhibit 8 – Team Health's Representative Email…………………………...20

Exhibit 9 – Team Health's Petition for Dr. Amine…………………………20

Exhibit 10 – Team Health's General Counsel Email………………………20

Exhibit 11 – Team Health's Email Communications…..…………………...21

Plaintiffs, by and through their attorneys, oppose the Defendant Team Health's Motion to Dismiss Plaintiffs' Amended Complaint, and state as follows:

## A.   <u>Counter-Statement of Material Facts</u>

### 1. The Amine Complaint

Drs. Amine P. Amine and Redwan Asbahi (hereinafter collectively "Relators") filed a *qui tam* Complaint on April 9, 2021, and a First Amended Complaint ("FAC") on June 30, 2023 (*See* ECF 1 and 20).  The claims in those cases are summarized as follows:

1. Fraud regarding "Ghost Rounding" in Michigan and Indiana;

2. Fraud regarding unnecessary pulmonary consults;

3. Anti-kickback violations regarding bonuses based on fraud

4. Retaliation against Drs. Amine and Asbahi

### 2.   The Saad Complaint

The *Saad qui tam* Complaint was filed on November 9, 2017, against IPC Hospitalists of Michigan, Inc., Inpatient Consultants of Michigan, P.C. and IPC Healthcare (TH was not a party)(**See "Exhibit 1, Saad Complaint"**).  That Complaint contained only two claims (Federal and State FCA claims).  Plaintiff in the *Saad* case strictly confined his claims to acts within the State of Michigan.  (*Saad* Compl. ¶ 8).  In support of the two claims, the *Saad* Complaint enumerated allegations against several physicians for treating patients and using billing codes

that reflected that the physician spent a longer amount of time with the patient than was possible based on the number of patients that physician saw on a particular day. The *Saad* claims are based on classic "upcoding" fraud where a company like TH, financially incentivizes physicians to use more financially beneficial billing codes to reflect that the physician spent more time with the patient than he/she actually did.

### 3. Partial Settlement of the *Amine* and *Saad* Claims

As explained above and clear upon reading the actual documents, there is no overlap of claims between the *Amine* and *Saad* Complaints. As such, the partial settlement in *Saad* cannot be a basis for dismissal of the *Amine* case.

Some of the *Amine* claims were partially settled by the United States, the State of Michigan and Team Health Holding Inc., (hereinafter "TH") in September of 2023 (**"Exhibit 1 - *Amine* Agreement"**). Although not a party to the *Saad qui tam*, TH also negotiated a partial settlement for its shell companies in the *Saad* case in August of 2023 ("**Exhibit 2 - *Saad* Agreement**").

Factually, Defendant grossly distorts the claims that the government agreed to settle. This is likely why they attach the Settlement Agreement from the *Saad* case, but not the Agreement from the *Amine* case. Instead, they ask this Court to take judicial notice of the press release instead of the actual Agreement. Plaintiff has attached both Agreements for this Court's review. In addition, below is a

summary chart that focuses on the material terms and briefly remarks how they affect the pending litigation.

| | *Amine* Agreement | *Saad* Agreement | **Impact on Current Litigation** |
|---|---|---|---|
| **Party Defendant(s)** | TeamHealth Holdings, Inc. | PC Hospitalists of Michigan, Inc.<br><br>Inpatient Consultants of Michigan, P.C.<br><br>IPC Healthcare | *Saad* Agreement does not apply to TeamHealth, which is the only Defendant in the current litigation. |
| **"Covered Conduct"** | Claims *arising from six (6) TeamHealth doctors*, identified as Drs. Mahmud Zalmut, Syed Raza, Qussai Salamah, Ali Hazimeh, Eyas Kanaan, and Bakhitair Mirza, who submitted claims for reimbursement to Medicare and Medicaid for *services and procedures provided to beneficiaries in Michigan and Indiana on the same day, which were not rendered during the period from January 1, 2019 through June 30, 2023*. | Claims from *June 17, 2014 - March 8, 2023*, arising from (1) upcoding inpatient CPT codes 99223, 99233, and 99239 for services provided or supposedly provided *in the State of Michigan*; and (2) allowing hospitalists to regularly work "impossible days" *within the State of Michigan*, in connection with the use of CPT billing codes 99221, 99222, 99223, 99231, 99232, 99233, 99238 and 99239.<br><br>**Upcoding** defined as fraudulent medical billing in which a *bill is sent for a service that is more expensive than the* | **Ghost Rounding** – The *Amine* Agreement removes these claims that occurred between January 1, 2019 to June 23, 2023 from the current litigation.  However, claims before January 1, 2019 are still being pursued in the current litigation.  The Amine Agreement does not address "Impossible Days"<br><br>**Impossible Days**<br>The *Saad* Agreement does not address Ghost Rounding.  "Impossible Day" was defined as a function of the services or procedures billed in one day (in Michigan) and compared to the amount of patients the  Plaintiffs claim that Defendant's providers were billing for patients in Michigan and Indiana on the same day.  The claim is based on geography, not the amount of services and procedures. All conduct in that agreement is confined to Michigan. |

| | *Amine* Agreement | *Saad* Agreement | Impact on Current Litigation |
|---|---|---|---|
| | | ***service that was actually performed.***<br><br>**Impossible day** occurs when a hospitalist allegedly ***provides for so many inpatient services or procedures in one day*** that there is no way the hospitalist could have performed them all. | **Unnecessary Pulmonology Consults** – This is not an "upcoding" claim as defined in the *Saad* Agreement. Instead, Plaintiff claim that there was fraudulent billing for services that were unnecessary and should not have been performed at all – Not that the service was necessary and Defendant just charged more than they should have.<br><br>The *Amine* Agreement does not address this claim at all. |
| **Conduct Not Covered** | The *Amine* Agreement specifically does not release any claims for "[a]ny liability to the United States (or its agencies) or the State of Michigan(or its agencies) for any conduct other than the Covered Conduct" | The *Saad* Agreement specifically does not release claims for "[a]ny liability to the United States (or its agencies) or the State of Michigan (or its agencies) for any conduct other than the Covered Conduct-including, but not limited to, conduct occurring outside the State of Michigan" | The Agreements are very clear that nothing other than the "Covered Conduct" is released. The Saad Agreement also specifies that absolutely no conduct occurring outside the state of Michigan is released. As noted above, Plaintiff is pursuing claims for all conduct that was not defined as "Covered Conduct" in the Agreements. |
| **Defendant Signatories** | Phil McSween (General Counsel of TeamHealth)<br><br>Linda Thacker (Chief Counsel of TeamHealth) | Phil McSween (General Counsel of TeamHealth)<br><br>Linda Thacker (Chief Counsel of TeamHealth) | Shows additional evidence of TeamHealth's control of shell entities as explained further in the brief |

TH investigated and negotiated the claims made in the *Saad* and *Amine* cases for more than a year prior to the above settlements. However, due to the distinct nature of the two *qui tam* complaints, the government and TH determined that each case should be partially settled separately. Logically, this makes sense considering the two cases had different parties, different claims, different covered conduct and different timeframes. Surprisingly, despite all of these clear differences, TH has decided to take a shot at convincing this Court to: ignore all these differences; rely on a press release as opposed to the actual Agreements and claims; treat the *Saad* and *Amine* matters as if they were the same case; and, adopt an interpretation of the Partial Settlement Agreements that absolutely cannot be derived from the Agreements themselves.

**B.** **Standard of Review**

Pursuant to Federal Rule of Civil Procedure 12(b)(6)[1], a district court may dismiss a complaint, or any part of it, for failure to state a claim upon which relief

---

[1] Defendant abuses Rule 12(b)(6) by attaching documents that bear more relevance to its arguments than Plaintiffs' Complaint. Moreover, many of the cases they cite in support of this tactic contain facts far different than those here. The following are snippets from those cases that show the differences. (... "public records of the judicial proceedings related to Plaintiff's arrest reflect that Plaintiff was arrested on November 28, 2017, and arraigned the next day, November 29, 2017. Price v. O'Donnell, No. 18-CV-13078, 2019 WL 5290809, at *2 (E.D. Mich. Sept. 27, 2019), report and recommendation adopted, No. 18-CV-13078, 2019 WL 5290914 (E.D. Mich. Oct. 17, 2019)); ("... a copy of Amini's EEOC charge clearly was attached to his complaint and referenced therein Amini v. Oberlin Coll., 259 F.3d 493, 502 (6th Cir. 2001)); ("In an action challenging a mortgage foreclosure or a failure to make required loan disclosures, this consideration may include documents "exchanged between plaintiff ... [and her] mortgage lender at the time of the transaction at issue." Welch v. Decision One, No. CIV.A. 12-10045, 2012 WL 4008730, at *2 (E.D. Mich. June 25, 2012), report and recommendation adopted, No. 12-10045, 2012 WL 4020976 (E.D. Mich. Sept. 12, 2012), aff'd, No. 12-2282, 2014 WL 13004385 (6th Cir. Dec. 30, 2014)); (Not relevant to this case, the court in Rahimi considered public documents to determine if a qui tam complaint was barred by the public disclosure bar. United States ex rel.

may be granted if the plaintiff has not set forth factual allegations in support of his claim that would entitle him to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(quoting *Twombly*, 550 U.S. at 570). Per *Ashcroft*, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

### C.   Legal Argument

### 1.   Counts I, II, IV and V Have Not Been Resolved and are Valid Claims.

Defendant asserts that the allegations contained in Counts I, II, IV and V of Relators' Complaint are based upon the same Medicare and Medicaid claims that have already been settled by the United States and State of Michigan. However, as noted above, neither the Relators nor TH were parties in the *Saad* case.[2] Additionally, the underlying claims; the "covered conduct"; and, the timeframes, are much different in each case. Therefore, Defendant's motion must be denied.

As referenced in the chart above, the *Saad* release involved "covered conduct" of upcoding and impossible days from 6/17/14 – 3/8/23. Here, Relators are not

---

Rahimi v. Rite Aid Corp., No. 2:11-CV-11940, 2019 WL 10374285, at *3 (E.D. Mich. Dec. 12, 2019), aff'd on other grounds, 3 F.4th 813 (6th Cir. 2021))

[2] Pursuant to Michigan law, a contract cannot bind a nonparty. *AFSCME Council 25 v Wayne County*, 292 Mich App 68, 80 (2011); *citing EEOC v Waffle House, Inc*, 534 US 279, 294 (2002).

pursuing any claims of "upcoding" or "impossible days".  Further, not only did the *Saad* Complaint confine all claims to the State of Michigan, the *Saad* Agreement in Paragraph 6d clearly states that the following is **not** released and is specifically reserved: "any liability to the United States or State of Michigan for any conduct other than the Covered Conduct, including, but not limited to, conduct occurring outside the State of Michigan". Lastly, Paragraph 14 of the *Saad* Agreement clearly states that the ".... Agreement is intended for the benefit of the parties, only.  Again, Neither TH nor the Relators were parties in the *Saad* case.

The *Amine* Agreement involved the "covered conduct" of claims being submitted for reimbursement for services provided to beneficiaries in Michigan and Indiana on the same day from January 1, 2019, through June 30, 2023.  Paragraph 3d specifically states that the following is not released and is specifically reserved: any liability to the United States or State of Michigan for any conduct other than the "covered conduct".  Paragraph 8 of the Relator's release states that the agreement is intended for the benefit of the parties, only.

Defendants direct this Court to a press release relating to the settlement of claims in support of their argument that the claims in this case were settled.  However, the press release is not the best evidence of the Settlement Agreements and provides  no guidance in fully describing the completely different claims each case presents and the terms of the partial settlement of both. The *Saad*

and *Amine* claims and settlement terms have no overlap at all. But TH tries its best to conflate the two by distorting the facts. For instance, they attempt to argue that "impossible days" defined in *Saad* should cover "ghost rounding" in Michigan and Indiana. However, TH is well aware that this case involves Defendants' billing for services *not* rendered while *Saad* involved overbilling for services that *were* rendered. This Court "may consider…public records…attached to defendant's motion to dismiss **so long** as they are referred to in the Complaint and are central to the claims contained therein." *Price v. O'Donnell*, No. 18-CV-13078, 2019 WL 5290809, at *2 (E.D. Mich. Sept. 27, 2019) *citing Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citation omitted). Moreover, "[i]f allegations in the Complaint are contradicted by public records or other evidentiary materials of which the court may take judicial notice, the court is not bound to accept those allegations as true." *Id*. Here, the Complaint was filed prior to the press release, and it was not referenced in the Complaint and certainly not central to Plaintiffs' claims. While it is in this Court's discretion to take judicial notice, Plaintiffs believe the more prudent course would be to examine the actual documents that the press release attempted to summarize. The Complaints and the Settlement Agreements in these cases provide full and complete information and provide better evidence than a press release. When those documents are closely examined it shows that there are no overlapping claims in the *Saad* and *Amine* Complaints and the *Saad*

Partial Settlement Agreement did not settle any claims in this case.  The *Amine* Agreement did partially settle some claims for "ghost rounding" from January 1, 2019, through June 30, 2023, but the Relators may still pursue claims for "ghost rounding" that occurred before and after that timeframe.

2.      **Relators Have Asserted Valid Claims for Fraud Claims Against Team Health pursuant to Fed. R. Civ. P. 9(b).**

In the *United States v. Robert E. Solinger*, 457 F.Supp 2d 743 (October 12, 2006), the court found that Rule 9(b) may have a liberal interpretation given the facts in a particular case. While the Plaintiff in *Solinger* did provide details of the fraudulent scheme, the court stated that such detail is not required. In regard to Plaintiff's pleadings in *Solinger*, the Court stated …. "that level of detail is unnecessary to alert Defendants to the nature of the fraud." *Id*. at 755.

In *United States ex rel. Joshi v. St. Luke's Hosp., Inc.,* 441 F.3d 552, 557 (8th Cir. 2006), the court outlined the necessity for representative samples of the fraud alleged and also stated that …"Clearly, neither this court nor Rule 9(b) requires [a relator] to allege specific details of every alleged fraudulent claim forming the basis of [the relator's] complaint. However ... [the relator] must provide *some* representative examples of [the defendants'] alleged fraudulent conduct, specifying the time, place, and content of their acts and the identity of the actors."

In *United States ex rel. Williams v. Bell Helicopter Textron Inc.,* 417 F.3d 450, (5th Cir.2005), the court agreed that fraud may be pled  on information and belief

{01676885.DOCX}  9

when the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge so long as the plaintiff sets forth the factual basis for his belief. *Id* at 454.

Here, Relators have advanced assertions based on information and belief and the belief is based on firsthand knowledge. For example, TH argues that in the FAC ¶158 are not sufficiently pled because Relators did not plead that they know how a single claim was billed or even submitted to the Government. This argument ignores the detailed facts contained in the FAC and the fact that the documents and specific information TH is within its guarded control.  TH also completely ignores the fact Relators have provided information directly from thirteen (13) patients who were victims of the scheme. *See* Relators' FAC at ¶ 101, ECF No. 20.

Based on TH's arguments and logic about such a strict interpretation related to specific pleadings of fraud to show precise time, place, names, evidence of claims billed to the Government and other details within TH's dominion and control, a potential Relator could only be someone who had unrestricted access to the TH physicians' patient charts, TH physicians' bank accounts, and access to TH's billing records. A prospective Relator under such stringencies would also need to plead the payment bonus structure for individual physicians, such as Zamlut, when compared against his productivity and also compared to the productivity of those who practiced medicine honestly. A Relator would need access to the salary of others in the Zamlut pod in order to show the inducement or kickbacks based on the scheme. Only then

could a Relator plead with the specificity that TH asserts is required under Rule 9(b). We submit that Relators observation and statements made to them by boastful physicians related to the bonuses TH paid them for the fraudulent scheme, coupled with representative samples is sufficient when viewed within the context of reasonable inferences at this early stage of the proceedings. This reasonable inference is bolstered by the fact that based on the allegations in the FAC and TH's own assessment of its own data, TH entered into a significant settlement to partially resolve some of the claims the Relators asserted in their Complaint.

In addition to ignoring the factual issues noted above, TH also ignores an important line of 6th Circuit case law that clearly indicates that Rule 9(b) is not to be read in isolation, but is to be interpreted in conjunction with FRCP 8. *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir.1988) ("[T]he two rules must be read in harmony."). FRCP 8 requires only "a short and plain statement of the claim" made by "simple, concise, and direct allegations." *Id.* FCRP 8 is commonly understood to embody a regime of "notice pleading" where technical pleading requirements are rejected in favor of an approach designed to reach the merits of an action. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim."). When read against the backdrop of Rule 8, it is clear that the

purpose of Rule 9 is not to reintroduce formalities to pleading, but is instead to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct. *Michaels Bldg. Co. at* 679 ("[T]he purpose undergirding the particularity requirement of Rule 9(b) is to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading.").

In the Relators' case, Dr. Amine actually spoke to patients at the DMC in July of 2020 where he obtained 13 patient samples (hereinafter "Relators' Representative Sample(s)" or "RRS") FAC, ECF No. 20. The RRS provided the patient's name, D.O.B, and the TH physician who was supposed to treat but only purported to treat the patient based on the notes in the patient records as observed by Relator Amine. In these 13 samples, the patients provide information on specific days indicating that they had not been seen and by whom. Relator Amine countersigned all RRS.

TH can easily ascertain whether or not the allegations are true, whether they have been billed, and if bonuses were allocated based on this type of conduct. TH also has precise data as to which hospitals these physicians worked and billed for on any given day, so they could easily identify, for example if any one physician billed for work in Indiana, Michigan and Pennsylvania all in the same day and for multiple days in a row. In fact, TH reviewed and analyzed this specific data during the governments' investigation and analysis of that data led directly to the partial

settlement in this case.  In fact, while the documents were never shared with Relators. the government did share a summary of its very conservative data of "ghost billing" which showed the following (**See Exhibit 4, Civil Investigative Demand "CID"**):

| Provider | Days of Duplicate Billing | Number Procedures Michigan | Paid Amount Michigan | Number Procedures Indiana | Paid Amount Indiana |
|---|---|---|---|---|---|
| Mahmud Zamlut | 217 | 2506 | $ 197,975 | 634 | $ 67,016 |
| Syed Raza | 190 | 1690 | $ 143,848 | 603 | $ 71,423 |
| Qussai Salamah | 178 | 1362 | $ 111,037 | 577 | $ 62,581 |
| Ali Hazimeh | 74 | 649 | $ 55,300 | 301 | $ 25,696 |
| Eyas Kanaan | 18 | 125 | $ 9,144 | 65 | $ 5,882 |
| Bakhtiar Mirza | 11 | 52 | $ 3,638 | 18 | $ 1,406 |
| TOTAL | 688 | 6384 | $ 520,941 | 2198 | $ 234,004 |

In addition, the Relators are eyewitnesses to "ghost rounding" and have direct personal knowledge of TH physicians seeing patients in one state and then having fraudulent medical notes created for other patients on the same day in another state. FAC ¶¶88-89, 93, 98-99, 101. Other than speaking to and collecting RRS directly from patients as he did, the way for Amine to plead fraud more particularly for ghost rounding, will be digitally, through documents such as work schedules, badge swipes, telephone records/locations, expense reports, and complete billing records. All such information is undoubtedly within the custody and control of TH.

In regard to Relators' unnecessary patient consults fraud claims, the Court should apply the same analysis as for the AKS claims because such information needed for more particularity is in the possession of TH. Relators are internists who are entrusted to refer to specialists when medically necessary. Relators allege that Zamlut and others engaged in unnecessary medical consultations based on firsthand observations. FAC ¶69,77-82. Relators further allege that Zamlut, who was both an internist and a pulmonologist, referred patients to himself and billed fraudulently when it was not medically necessary for a pulmonology consultation. FAC ¶77-82. Relators also witnessed and they too were pressured to refer pulmonology consults to Zamlut that were not medically necessary. FAC ¶ 79. Relators also alleged that they witnessed the aforementioned conduct, they estimated how often they believe it occurred (FAC ¶ 103) and they asserted that such conduct remained ongoing (FAC ¶114) as of the time of filing the FAC on June 30, 2023. Based on their observations, Relators pled an estimate as to how many times unnecessary consultations occurred.

TH arguments that Relators must show that TH submitted a claim must fail. In the case of *United States ex rel. Prather v. Brookdale Senior Living Communities, Inc*. (Prather I), 838 F.3d 750, 769 (6th Cir. 2016), the 6th Circuit Court reversed the lower who dismissed Plaintiff's claims for failure to plead that false claims were in fact submitted for payment in cases of detailed fraudulent schemes. *Id*. at 769. The Court noted that ……'the requirement that a relator identify an actual

false claim may be relaxed when, even though the relator is unable to produce an actual billing or invoice, he or she has pled facts which support a strong inference that a claim was submitted.' *Id* at 769. Relators have pled in multiple paragraphs in the FAC that a fraudulent scheme related to ghost rounding, kickbacks and medically unnecessary consults that occurred at least in part because TH and Zamlut controlled the billing process and such arrangement facilitated like-minded TH physicians to bill more than necessary or permitted by law in exchange for money (bonuses). When ¶¶60,61,88,96, 105, and 147 are read together, it is reasonably inferred that Relators were sufficiently knowledge of billing, how it was billed and why it was billed.

3. **Relators can pursue AKS claims against TH if brought under the FCA.**

Relators' FAC related to Counts VI and VII correctly referenced the AKS statue, but mistakenly referenced 42 U.S.C 1320a-7(b) instead of 42 U.S.C. 1320a-7b. Substantively, TH argues these allegations must fail as a matter of law because the AKS does not contain a private right of action. However, a cause of action based on the AKS can be pursued under the FCA.

FCA actions may be predicated upon a variety of underlying allegations. These include violations of the Stark law and the so-called Anti–Kickback law, 42 U.S.C. § 1320a–7b, both of which are designed to protect against fraudulent overutilization of government-reimbursed healthcare services. *U.S. ex rel.*

*Thompson v. Columbia/HCA Healthcare Corp.,* 20 F.Supp.2d 1017, 1047 (S.D.Tex.1998) *("Thompson II"); U.S. ex rel. Pogue v. Am. Healthcorp, Inc.,* 914 F. Supp. 1507, 1513 (M.D. Tenn. 1996); *see also U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 902 (5th Cir. 1997).

This is so even though neither the Stark law nor the Anti–Kickback law provides for a private right of enforcement. *Solinger,* 457 F.Supp.2d at 754 (citing *West Allis Mem'l Hosp., Inc. v. Bowen,* 852 F.2d 251, 255 (7th Cir.1988)). Relators in this case did not and are not filing a private cause of action under an AKS theory, rather, they have used the only appropriate vehicle - the FCA - to bring such claims.

As it relates to Relators' AKS claims that clearly have not been settled or even referenced by the *Saad* or *Amine* Settlement.  Furthermore, it can be reasonably inferred that the RRS of 13 patients show a sampling of conduct that was part of the scheme based on the AKS, especially when the FAC is read in totality. Relators pled that TH employee bonuses were based on revenue generated from fraud (FAC ¶¶79,108,110) and that TH knew and encouraged bonuses based on revenue generated (FAC ¶¶92, 104-106), and this conduct began almost immediately and continued throughout their employment becoming incrementally more flagrant as time went on. FAC ¶¶62, 114. Information related to Zamlut's pay, TH's pay structure that induced the conduct set forth in the FAC ¶¶74-76, and additional financial data, is in TH's possession, custody and control.

Arguments set forth by TH related to knowledge are not supported by the law and are unrealistic at this stage. For example, whether the conduct at issue was performed "knowingly and willfully" is a question of fact not properly decided on the pleadings. Under FRCP 9(b), intent and knowledge may be averred generally by the Plaintiff. Relators are required to plead allegations that are presumed true at this stage without the need to plead further as argued by TH. Irrespective, the FAC includes allegations of conduct based on eyewitness accounts that provide reasonable inferences that the conduct was performed "knowingly and willfully" See FAC ¶¶92, 104-106.

Another fact that bears on the notice issue is, **it was TH that investigated and negotiated a partial settlement in this case**. If any doubt remains, the notice requirement which is the underpinning of Rule 9(b) is satisfied by the fact that TH negotiated with the Government starting in March of 2022 for more than one (1) year prior to partially settling this case ("TH Notice Period"). The Government sent CIDs requesting information from TH prior to the TH Notice Period pertaining to all three areas of the fraud allegations as set forth in the OC.

During the TH Notice Period, TH requested and received a redacted version of the Relator's original complaint (Relators' names only redacted). The allegations and areas of fraud were discussed by the Government and TH and then the Government communicated TH's position on the allegations to Relators. It is

reasonable to infer that TH has been well aware of precise claims at issue. As such, an appropriate balance exists between affording TH the protections that Rule 9(b) was intended to provide and allowing Relators to pursue complex and far-reaching fraudulent schemes without being subjected to unrealistic pleading requirements given the circumstances of this case. Further, Plaintiffs are not required to do so at the pleading stage, even under the heightened standard of Rule 9(b). *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.,* 838 F.3d 750, 771 (6th Cir. 2016) ("When Rule 9(b) applies to a complaint, a plaintiff is not expected to actually prove his allegations."). As the Sixth Circuit has repeatedly noted, the purpose of Rule 9(b) is to give a defendant notice of the precise wrongful conduct it is being accused of. *Id.*; *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.,* 501 F.3d 493, 503 (6th Cir. 2007) ("[T]he purpose of Rule 9 is not to reintroduce formalities to pleading, but is instead to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct."). Erlanger clearly knows what it is accused of and which claims are allegedly fraudulent. (*See* Doc. 143, at 7 ("The crux of Relators' [amended complaint] is that Erlanger allegedly violated [Medicare rules] by performing concurrent surgeries.").) Rule 9(b) is intended to be a shield to protect defendants from vague, baseless claims; it is not a sword to be used to destroy potentially meritorious complaints. *See Prather*, 838 F.3d at 771 (footnote omitted)

**4.     Count VIII Asserts a Valid Retaliation Claim Against Team Health.**

In their motion, TH does not disclose their legal relationship or any other relationship with Inpatient Consultants of Michigan, P.C. ("ICM") and Medicine Services of Tennessee, P.C. ("MHST"). They are clearly aware of the written agreements with Relators, but merely argue that Relators were employed by ICM and HMST and pretend as if TH is hardly familiar with these entities. However, TH is more than familiar with ICM and HMST as they are one and the same, assuming that ICM/HMST even exist beyond being on paper. Furthermore, Relators have pled throughout their complaint that TH was their employer and TH was the facilitator and primary beneficiary of the fraud.

Operationally, ICM and HMST never existed to Relators. ICM and HMST are clearly amongst numerous alter egos entities ("Alter Egos") controlled by TH in order to implement their healthcare staffing business. The Relators, during their entire tenure, only ever dealt with TH. **It is alleged without equivocation that Relators were hired, fired and controlled by TH and that the fraud was committed by TH physicians**.

Under FRCP 12(b)(6), TH inappropriately went beyond the pleadings and attached various exhibits to its motion in order to try to pass any liability from itself onto its Alter Ego entities ICM and HMST. To the extent the Court is considering

the ICM/HMST contracts in the context of the retaliation and statute of limitation

("SOL") issues, Relators submit the following exhibits:

A) An email from Donna Parker terminating Dr. Asbahi on October 6, 2020, where she attaches a letter signed by her on behalf of HMST, yet Donna Parker sent the letter from a TH email address of donna_parker@teamhealth.com. Unlike the termination letter sign off, in the email sign-off, Donna Parker is representing Team Health and most notably, she is a "Contract Specialist" for TH's "Northeast Group." In the same termination letter, Donna Parker advises that should Dr. Asbahi have any "questions concerning this matter, please contact Linda Dinkel, Vice President of Operations, at linda_dinkel@teamhealth.com." **(EXHIBIT 5 - Donna Parker Email )**;

B) In an email sent to Dr. Amine on June 5, 2020, that will substantively be presented as one act of retaliation by TH, there is no distinction between TH and the ICM. In this instance, Melinda Evans sent an email from (Melinda_Evans@teamhealth.com) to Dr. Amine representing herself as "Sr. HR Associate-TeamHealth." In the attached letter dated June 4, 2020, Melinda Evans states …. "Lastly, your H-1B will be withdrawn on August 19, 2020." Evans in the letter signs off on behalf of "Team Health-Human Resources." **(EXHIBIT 6 - Evans TH Human Resources)**;

C) Even amongst the contracts attached by TH to its motion, an Alter Ego is evident. TH argues that Dr. Asbahi signed with HMST, which according to the contract was represented/executed by Eugene R. Johnson. First, the offer letter is sent with a cover letter from TH - not HMST. Next, this contract was emailed to Dr. Asbahi from TH human resources. Lastly, Eugene R. Johnson signed the contract via DocuSign from a TH email 32 seconds after he viewed it from the email: eugene_johnson@teamhealth.com. **(EXHIBIT 7 - TH Countersigns HMST contract )**;

D) In conjunction with his employment contract with ICM, TH leaves little room for debate that the actual functional employer is TH. TH required Dr. Amine to sign an "Authorization and Release" to supply TH and **not** ICM for substantial personal and professional information. The executed release was sent by TH, returned to TH with no reference to ICM. The language in the release authorizes information to TH as well as… *'its employees, representatives and agents ("TeamHealth Representatives")…"* In fact, the

document explicitly states in the first paragraph that it is for the purpose of "….evaluating you for ongoing contracting with TeamHealth." **(EXHIBIT 8 - TH Representative Email )**;

*E)* TH petitioned for Dr. Amine's green card as his employee. This is evident from TH's external legal counsel who sent an email directly to Tiffany Goins ([Tiffany_Goins@teamhealth.com](mailto:Tiffany_Goins@teamhealth.com)); **(EXHIBIT 9 - TH Petition for Dr. Amine)**

*F)* Dr. Amine received an email from TH's General Counsel *(same attorney who signed Saad Settlement and Relators Settlement for different entities)* to hold and preserve documents relating to the violation of the FCA in which TH received notice of. On the last page of this email makes clear it is subject to "TH's Records and Retention Policy." **(EXHIBIT 10 - TH's General Counsel Email)**

Even labeling ICM and HMST Alter Egos of TH is generous. ICM and HMST do not even have a website. **Relators never received an email, no phone number exists, nor did they ever receive any communication from anyone purporting to be from these entities**. Most importantly, all communications and decisions made impacting Relators' employment were communicated to and from individuals using TH email addresses, this includes Defendant Dr. Zamlut who only used mzamlut@teamhealth.com and Dr. Zuberi who communicated through Mussaret_Zuberi@teamhealth.com. The only email address provided to Relators during their employment was a TH email address, everyone named in the complaint used the same TH domain, i.e., Dr. Amine was issued amiami@teamhealth.com. **(EXHIBIT 11 – TH Email Communications).** Therefore, it is clear that TH is

properly before the Court under the plain meaning of § 3730(h)(1), the common law joint employer doctrine.

**5.    TH is Properly Before the Court Pursuant to § 3730(h)(1).**

> The FCA's anti-retaliation provision, § 3730(h)(1), states:
> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

TH argues that employees may only bring actions against their actual employer under § 3730(h). *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1062 (6th Cir.2014). However, in 2009, Congress expanded the scope of §3730(h) to cover "[a]ny employee*, contractor, or agent*."[3]

The False Claims Act: Fraud Against the Government § 5:1. As such, in addition to an employee's actual employer, "the current version of the statute also covers independent contractors and other employment-like relationships." *Tibor v. Mich. Orthopaedic Inst.*, 72 F.Supp.3d 750, 759 (E.D.Mich.2014) (emphasis added).

---

[3] *Id*. (citing Fraud Enforcement and Recovery Act of 2009, Pub. L. 111–21, 123 Stat. 1617) (emphasis in original); *see also Carnithan v. Cmty. Health Sys., Inc*., No. 11–CV–312–NJR–DGW, 2015 WL 9258595, at *4 (S.D.Ill. Dec. 18, 2015) (collecting cases). "The 2009 Amendments to section 3730(h) added 'contractors' and 'agents' to the description of persons within the scope of the Act's protections. Although the amendments did not define those terms, it is clear that the purpose was to ensure that the protections of the Act extended beyond a traditional employment relationship. The amendments sought to address court decisions that had concluded that persons who were not technically employees, such as independent contractors or doctors without traditional employment relationships with hospitals."

Indeed, § 3730(h)(1) plainly covers more than just employees, contractors, and agents as it prohibits retaliation for "lawful acts done by the employee, contractor, agent or associated others."

In addition to being alter egos, ICM and HMST may also be viewed as contractors of TH as Relators provided health care services ultimately for the benefit of TH and its hospital clients such as the DMC. It was pled that it was Zamlut who terminated Relators' employment based on TH's instruction. Relators' FAC, ¶147. Under Section 3730(h)(1), protections exist for "[a]ny employee, contractor, or agent." ICM and HMST are either alter egos, contractors, agents or "all of the above" of TH. TH is therefore liable for any improper retaliation against Relators who engaged in protected conduct while serving in their capacity as employees, contractors or agents of TH." At the very least, Relators had an "employment-like relationship" with TH. Further, and according to Relators' pleadings, TH not only had extensive involvement in the actions that led to Relators' termination, they had the *only* involvement. Relators' FAC lays out that Zamlut was the pod leader working for TH, he reported to TH, TH controlled all aspects of Zamlut and Relators' employment, including hiring and firing, and time place, and manner of employment. FAC ¶¶148-149, 152-153. These facts clearly support the finding of an employment-like relationship between Relators and TH.

While TH cited the ruling in *Vander Boegh v. Energysolutions, Inc*, 772 F. 35, 1056 where the court dismissed plaintiff's claim because he could not show he was an "employee", the facts are incongruent with Relators Asbahi and Amine. In *Vander Boegh*, the court dismissed Plaintiff's claim because Vander Boegh never worked for EnergySolutions (Defendant), he was never hired, and therefore EnergySolutions never controlled the manner or means of Vander Boegh's production. The court went on to state that to adopt Vander Boegh's position that he was an employee when he was merely an applicant would require a strained and unnatural reading of "employee." The court declined to read "employee" in such a peculiar fashion. However, the *Vander Boegh* court cited congressional intent surrounding the technical aspects of what type of legal relationship a relator would need to establish to be afforded protection from retaliation under the FCA as an 'employee.' *Vander Boegh* reasoned that Congress intended to " 'correct this loophole' " and extend protection to " 'individuals who [a]re not technically employees within the typical employer[-]employee relationship, but nonetheless have a contractual or agent relationship with an employer.' " *Id.* at *3 (quoting S.Rep. No. 110–507, 110th Cong., 2d Session (Sept. 25, 2008), 2008 WL 4415147, at *26–27). Additional legislative history supports this interpretation. *See* 155 Cong. Rec. E1295–03, 2009 WL 1544226 (June 3, 2009) (statement of Rep. Howard L. Berman stating, as the House sponsor of the amendment, that the purpose was to

"cover[ ] ... retaliation against contractors and agents of the discriminating party who have been denied relief by some courts because they are not technically 'employees' " and to "protect persons who seek to stop [FCA violations] regardless of whether the person is a salaried *employee,* an *employee* hired as an independent contractor, or an *employee* hired in an agency relationship.") (emphasis added). Despite this loophole being firmly closed, TH would have this Court resurrect it in a desperate attempt to escape clear liability. In doing so, they ask this Court to endorse TH's organizational structure that gives them complete control over physicians but utilizes shell companies to sign the employment contracts so that "on paper" the shell company, not TH, is the "employer". The goal of this scheme is to make sure TH gets all the benefits of having employees and none of the burdens of being their employer. However, there is no factual or legal support for TH's argument and this Court should deny its motion.

Plaintiffs' common law theories also support finding that TH is a proper party in addition to § 3730(h)(1), ICM/HMST and TH are joint employers and that TH is an alter ego of ICM/HMST. "One entity is the joint employer of another entity's formal employees and thus liable under federal and state anti-discrimination laws, if the two 'share or co-determine those matters governing essential terms and conditions of employment.' " *Sanford v. Main St. Baptist Church Manor, Inc.*, 449 Fed.Appx. 488, 492 (6th Cir.2011). "The major factors in this determination are the

ability to hire, fire, and discipline, affect compensation and benefits, and direct and supervise performance." All of these factors weigh in favor of Relators as discussed earlier and Relators pled all retaliation claims against TH.

At the very least, the pleadings support a question of fact as to whether ICM/HMST and TM were joint employers. Here, the Relators have alleged that all the retaliation against them was done by TH and TH employees. FAC ¶147; *see also* above exhibits. Based on the factual allegations in the FAC, and the exhibits noted above, TH was the only moving force behind Relators' termination. Relators were hired, controlled by, and eventually fired by TH.  As such, TH is the appropriate corporate defendant for the fraud and retaliation claims.

**6.    Relators have pled a valid claim for Retaliation Claim under the FCA.**

FCA retaliation claims are evaluated under the *McDonnell–Douglas* burden-shifting framework. *Scott v. Metro. Health Corp.,* 234 F. App'x 341, 346 (6th Cir.2007). To establish a prima facie case under § 3730(h), Plaintiff must prove that: (1) she engaged in protected activity; (2) Defendant knew that she engaged in protected activity; and (3) Defendant discharged or otherwise discriminated against her as a result of the protected activity. *U.S. ex. rel. Marlar v. BWXT Y–12,* L.L.C., 525 F.3d 439, 449 (6th Cir.2008).

In analyzing how the 3 factors are met in this case, Relators assert the following:

1.) Relators certainly engaged in protected activity and pled as much in the FAC. They lay out many examples in which they reported fraudulent conduct to Zamlut and Dr. Zuberi. For example, in ¶146 they outline one instance of many when they specifically reported ghost rounding, medically unnecessary consults and even an instance where such conduct led to a patient death. Other examples of protected activity of Relators' attempts to stop FCA violations are set forth in FAC ¶¶148,157, 151. It has been pled that Relator Amine even reported the fraud to Zamlut's superior only to be chastised.

2.) The second element of the prima facie case requires Plaintiff to prove that her "employer knew that [s]he engaged in a protected activity." *Marlar,* 525 F.3d at 449. In that case, because Plaintiff testified that she reported her concerns about a potential instance of Medicare fraud directly to Yadmark, the court found that plaintiff satisfied this element. In this matter, TH did know that Relators engaged in the protected activity of reporting the fraud. As discussed in the prior section, Zamlut and Zuberi told Relators they worked for TH, they used TH emails, and TH's Human Resources personnel ultimately terminated Relators. Here, reasonable inferences may be drawn regarding knowledge. Furthermore, it has been pled (after Relators reporting fraud and refusing participation in the same) that Zamlut told Relators that if they did not generate more revenue, TH directed him to terminate them, ¶146.

3.) No doubt exists that TH terminated both Relators based on the pleadings, the communications came from TH Human Resources employees, sent from TH emails. For the purpose of this 12(b)(6) motion, and contrary to TH's assertions otherwise, it has been pled by Relators that they have set forth in the FAC a causal connection between the reporting, retaliation *and* their termination. "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Dye v. Office of the Racing Comm'n,* 702 F.3d 286, 306 (6th Cir.2012) ("A lapse of two months, as is the case here, is sufficient to show a causal connection, and the district court erred in holding otherwise."). In the FAC, ¶153-154 as pled, illustrates how Zamlut punished Amine sending him to less desirable places to work, and how he "verbally terminated him." FAC ¶157 sets forth how Relators were both ultimately told it was a "business decision" (meaning not enough work) and in ¶159, Relators pled with specificity that they knew this was pretextual because of the shortage of physicians in the workplace during the pandemic. In FAC ¶160, Relators allege that two

physicians were hired shortly thereafter, thus proving that their termination was pretextual. Furthermore, Asbahi was terminated in the middle of a pandemic without notice or call for allegedly not working enough in October 2020, when he was locked out of access to TH system regarding his work in Indiana. FAC ¶158. This was at least the second act of retaliation against Asbahi. Asbahi was previously terminated from his Detroit work in 2019. *See* OC ¶¶83-85.  Relator Amine pled that he was terminated in August of 2020 (see OC ¶11), he details this in OC ¶86-88.  These terminations occurred during the height of a pandemic when internal medicine physicians were highly sought after.

Finally, as is with other employment-related retaliation claims, *qui tam* relators may prove their case under the False Claims Act (FCA) by either direct or circumstantial evidence. 31 U.S.C.A. § 3730(h)(1).

**VII.** ***ALL statute of limitations claims including those opposing Retaliation Claims raised by TH should be denied based on facts pled by Realtors and alternatively based on the FRCP 15(c )2.***

Relators filed their original complaint on April 9, 2021 (OC). In its OC, in relevant part related to the employment retaliation, Relator Amine alleged that because they refused to participate in the fraud, they had to work out of state where they did not make as much money ¶86. Amine was threatened to be replaced if he did not generate more revenue ¶87. Amine received his first 90-day notice of termination ¶88 and Amine pled that he was constructively discharged. ¶11. Asbahi in his OC pled about the pressure to commit fraud ¶79, that he ultimately resigned because of it ¶83-84, but moved to another hospital within TH. ¶93. These pleadings were sufficient notice so that Defendants are not later surprised by any further amendments that may relate back as discussed herein..

In its only amended complaint, Relators pled more specific details surrounding their retaliation claims as outlined in the previous section. As pled in the FAC, Relator Asbahi's subsequent termination was in the fall of 2020. *See* FAC ¶158. TH acknowledged in its filings that Relator Asbahi pled he was terminated in October 2020, ECF No. 49. Although Asbahi was not required to plead or attach exhibits of when he was terminated, for precise information on when he was terminated by TH, well within the 3-year SOL. (Ex 2-Asabhi Termination October 5, 2020). As pled in the original complaint on April 9, 2021 (hereinafter "OC"), Amine's termination occurred in August 2020. *See* OC ¶11. Even if analyzed as if the Relators' FAC date was the first pleading, this also falls safely within the 3-year SOL.

"Relation back" is governed by FRCP 15(c)(2), which states:

**(c) Relation Back of Amendments.** An amendment of a pleading relates back to the date of the original pleading when ... (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.

Rule 15(c)(2) is "based on the notion that once litigation involving particular conduct or a given transaction or occurrence has been instituted, the parties are not entitled to the protection of the statute of limitations against the later assertion by amendment of defenses or claims that arise out of the same conduct, transaction, or occurrence." *Brown v. Shaner,* 172 F.3d 927, 932 (6th Cir.1997). Rule 15(c)(2) does not define the scope of the terms "conduct, transaction, or occurrence."

When applying this standard to the facts of a given case, the Court gives context to those terms not by generic or ideal notions of what constitutes a "conduct, transaction, or occurrence," but instead by asking whether the party asserting the statute of limitations defense had been placed on notice that he could be called to answer for the allegations in the amended pleading. *See Santamarina v. Sears, Roebuck & Co.,* 466 F.3d 570, 573 (7th Cir.2006) ("The criterion of relation back is whether the original complaint gave the defendant enough notice of the nature and scope of the plaintiff's claim that he shouldn't have been surprised by the amplification of the allegations of the original complaint in the amended one."). The Rule also must be interpreted in light of the "fundamental tenor of the Rules," which "is one of liberality rather than technicality." *Miller v. Am. Heavy Lift Shipping,* 231 F.3d 242, 247 (6th Cir.2000) (citing *Dominguez v. Miller,* 51 F.3d 1502, 1509 (9th Cir.1995). Given all of the pleadings set forth in OC as to both Relators' retaliation claims (see OC ¶ 79, 83, 84 and 93 for Asbahi & OC ¶ 11, 86-88 for Amine ), 15(c)2 is satisfied, as detailed and sufficient factual notice was provided to TH so that no surprise exists.

### D.   <u>Conclusion</u>

The "12(b)(6)" Motion TH filed should be denied for the reasons stated herein. In the event the Court finds any of the claims set forth by Relators to be deficient, the Relators respectfully requisite an order permitting them a reasonable

time to amend the complaint. Under Rule 15, a district court should "freely give" leave to amend a pleading "when justice so requires." FRCP 15(a)(2). The Sixth Circuit has further explained that "where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.,* 342 F.3d 634, 644 (6th Cir. 2003).

**Dated: September 9, 2024**

Respectfully Submitted,

*ABDRABBOH LAW*

/s/Mohammed Abdrabboh
Mohammed Abdrabboh (P61989)
*Counsel for Relators*
1360 Porter Street, Suite 250
Dearborn, MI 48124
(313) 582-5800
mabdrabboh@hotmail.com

-and-

*FIEGER, FIEGER, KENNEY & HARRINGTON, P.C.*

/s/Gregory W. Wix
GREGORY W. WIX (P65424)
DONALD H. DAWSON, JR. (P29692)
*Co-Counsel for Relators*
19390 W. Ten Mile Road
Southfield, MI 48075
(248) 355-5555
g.wix@fiegerlaw.com
d.dawson@fiegerlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on **September 9, 2024**, I caused to be electronically filed the foregoing document with the U.S. District Court's Clerk of the Court using the ECF system, which will send notification of such filing to counsel of record.

<u>/s/ Myra F. Manalo</u>
Paralegal